UNITED STATES of America,
Plaintiff-Appellee,

v.

John Albert KELLY, D.J. Dorn, and Miguel Falcon, Defendants-Appellants.

UNITED STATES of America,
Plaintiff-Appellee,

v.

Evasio GARCIA, George Garcia, and Jon Taute, Defendants-Appellants.

Nos. 83–8261, 83–8267.

United States Court of Appeals,
Eleventh Circuit.

Jan. 10, 1985.

Amanda Maxwell, South Miami, Fla., for J.J. Dorn.

Richard Hersch (court-appointed), South Miami, Fla., for Falcon.

Dennis W. Hartley, Colorado Springs, Colo., for Kelly and D.J. Dorn.

Frank A. Rubino, Coconut Grove, Fla., for George Garcia.

Highsmith & Strauss, Ronald I. Strauss, Phillip Glatzer, Coconut Grove, Fla., for Evasio Garcia and Taute.

Joseph D. Newman, Asst. U.S. Atty., Savannah, Ga., Sara Criscitelli, U.S. Dept. of Justice, Washington, D.C., for the U.S. in both cases.

Frances J. Martin, Washington, D.C., for the U.S. in No. 83–8267.

Margaret Miller, Washington, D.C., for the U.S. in No. 83–8261.

Before HENDERSON and HATCHETT, Circuit Judges, and NICHOLS *, Senior Circuit Judge.

HATCHETT, Circuit Judge:

This appeal reviews the appellants' convictions for conspiracy to possess, import, and distribute marijuana, as well as convictions for possession and importation of marijuana. We reverse the conviction of one appellant; the convictions of the other appellants are affirmed.

I.

At 2 a.m. on November 23, 1982, a "concerned citizen" telephoned Officer Dwayne Swygert, a supervisor with the United States Customs Patrol in Savannah, Georgia, relating that "Jerome Brown was supposedly organizing a smuggling venture in the McIntosh area. Jerome Brown had allegedly approached a local McIntosh resident, Bruce Townsend." The caller provided information leading to the location of the "Gigi" in the Eulonia, Georgia, area on Cedar Creek at Jacob's Dock. From the time of the location of the "Gigi" on the

afternoon of November 23rd, the Customs agents conducted surveillance on the "Gigi" continuously, except for a period of nine hours on November 26. Surveillance ceased thirty minutes after the "Gigi" left the dock at 3:45 a.m. on November 28th.

The government's chief witness was Webster Tyrone "Jerome" Brown.[1] During Thanksgiving week in 1982, Brown received a telephone call from George Garcia. Garcia requested that Brown locate "a car," which Brown took to mean a shrimp boat. Pursuant to that conversation, Brown contacted Bruce Townsend, the owner of a shrimp boat named the "Gigi." Brown, Townsend, Bud Thomas, and Evasio Garcia boarded the "Gigi." Evasio Garcia inspected the engine, checked for evidence of water seepage, measured certain storage compartments on the boat, and conducted an inventory of the electronic equipment on board. On November 23, Joseph Saunds met with Brown and Wilfredo Cejas in a local motel to discuss Saunds's role as captain of the "Gigi."[2] Cejas told Saunds that the "Gigi" should rendezvous with a freighter named the "Largo Izabal" at 12 Noon on November 28th. Further, Cejas identified a rendezvous point on a nautical chart and instructed Saunds on how to tie up the "Gigi" with a larger ship so that the marijuana could be transferred to the "Gigi" in rough seas. Saunds was instructed to take his cargo to Belvedere Landing where a crew would offload the marijuana into trucks.

On Saturday, November 28, at about 3:30 a.m., Brown delivered to the dock the "Gigi's" crew, including John Dorn, Dennis Dorn, John Kelly, and Miguel Falcon. Brown then drove Cejas back to a motel and then went to meet Saunds for the purpose of delivering "front money" to him prior to the voyage of the "Gigi." Brown returned to the motel, picked up Cejas, and they returned to Brown's home where they

---

* Honorable Philip Nichols, Jr., U.S. Circuit Judge for the Federal Circuit, sitting by designation.

1. Brown testified as a government witness pursuant to a plea agreement in which Brown pleaded guilty to one count of conspiracy to import marijuana.

2. Saunds pleaded guilty to importation of marijuana and testified for the government. Cejas also pleaded guilty to conspiracy to possess with intent to distribute marijuana.

met with George Garcia, Evasio Garcia, Jon Taute, and another unidentified individual.

The "Gigi" departed for its rendezvous with the "Largo Izabal." The U.S. Coast Guard ship "Cape Upright" waited off the mouth of Sapelo Sound, ready to follow the "Gigi." At approximately 9:30 a.m., radar contact was made with the "Gigi" as it left the Sound. At 12 Noon the "Gigi" reached the appointed rendezvous spot about thirty-five miles offshore and anchored to await arrival of the mother ship. While waiting, Saunds showed Kelly the radar readings and received instructions that the mother ship would arrive at the rendezvous point by 5 o'clock.[3] At 5 o'clock, Saunds received a radio message from the freighter announcing its arrival. Once the shrimp boat and the freighter were secured together, the "Gigi's" crew spent approximately two hours transferring the bales of marijuana to the "Gigi."

On shore, a group of Cubans staying at Brown's house prepared to go to Belvedere Landing to assist in the offloading operation. A few hours before dawn on November 28, Brown drove the Cubans in a van to the entrance of Harris Neck Road near Highway 31. Equipped with a walkie-talkie, Brown maintained a look-out position while the Cubans drove on to the offload site at Belvedere Landing.

After the transfer of the marijuana, the "Gigi" headed back to Sapelo Sound. Once the "Gigi" entered the channel, a Customs vessel seized and boarded the boat, arresting all of its crew. The Coast Guard seized the mother ship after fifteen hours in which the Coast Guard fired fifteen warning shots and a series of disabling shots.

On shore, Drug Enforcement Administration agents arrested Cejas and George Garcia at a camper parked near the Bell Bluffs Campground. As Agent Craig approached the camper, he heard a warning over the radio to the effect that "Charlie's got company ... the monkeys are out."[4] As Agent Craig got out of his vehicle, Cejas exited the camper. George Garcia was discovered inside the camper at the sink. Both men were arrested. The camper contained "a large amount of radio equipment." Customs agents also arrested Evasio Garcia and Jon Taute while they were sitting in a car parked near the driveway of Brown's house. State agents seized the two trucks to be used in the offloading operation and arrested the occupants. Other members of the offload crew were arrested on Harris Neck Road and in the nearby woods. A GMC van and an abandoned radio and hunter's stool were seized near the offload area.

## II.

Appellants, George Garcia, Miguel Falcon, Jon Taute, Evasio Garcia, John Kelly, and Dennis Dorn were indicted on December 3, 1982 in the Southern District of Georgia.[5] All defendants, except Falcon, were charged with conspiracy to possess marijuana with intent to distribute, in violation of 21 U.S.C.A. §§ 846 and 841(a)(1) (1982), and conspiracy to import marijuana in violation of 21 U.S.C.A. §§ 963 and 960 (1981).[6] In addition, Dorn and Kelly were

---

3. On cross-examination, Saunds testified that while he received his instructions and orders from Brown and Cejas, it was, nevertheless, apparent to him that John Kelly "just knew more than anybody else did."

4. While stationed as a lookout at the entrance to the Belvedere Landing, Brown heard the same warning over his walkie-talkie. He fled the scene, but was arrested at a local motel the next day.

5. Appellants, John Dorn, Miguel Falcon, and John Kelly, were indicted in case number CR 282–29, while appellants, George Garcia, Evasio Garcia, and Jon Taute, were indicted in case number CR 282–30. We have consolidated the cases for argument and decision.

6. Title 21 U.S.C.A. § 846 (1982) provides:
 § 846. Attempt and conspiracy
 Any person who attempts or conspires to commit any offense defined in [18 U.S.C.A. §§ 801–904; Drug Abuse Prevention and Control, Control and Enforcement] is punishable by imprisonment or fine or both which may not exceed the maximum punishment prescribed for the offense, the commission of which was the object of the attempt or conspiracy.
 Title 21 U.S.C.A. § 841(a)(1) (1982) provides:
 § 841. Prohibited Acts A
 (a) Unlawful Acts
 Except as authorized by this subchapter, it shall be unlawful for any person knowingly or intentionally—

charged with possession with intent to distribute and aiding and abetting, in violation of 21 U.S.C.A. § 841(a)(1) (1982) and 18 U.S.C.A. § 2 (1982), and importation in violation of 21 U.S.C.A. § 952(a) and 18 U.S. C.A. § 2; Falcon was charged with importation.[7]

The jury found George Garcia, Jon Taute, and Evasio Garcia guilty of conspiracy to possess with intent to distribute and conspiracy to import; it found Miguel Falcon guilty of importation; and it found John Kelly and Dennis Dorn guilty of possession with intent to distribute, conspiracy to possess with intent to distribute, importation, and conspiracy to import.

The six appellants raise five issues on appeal. First, they raise the issue of sufficiency of the evidence, each claiming that the evidence, even taken in a light most favorable to the government, was insufficient to convict him. Second, Jon Taute claims that the trial court erred in refusing to suppress his incriminating statements obtained in violation of his sixth amendment right to counsel. Third, John Kelly claims that his right to assistance of counsel was violated through the denial of his motion for continuance to change counsel. Fourth, John Kelly and Dennis Dorn claim that their right to conflict-free assistance of counsel was violated because their lawyer, Ryland, was a "target" of government investigation in this case. Fifth, John Kelly and Dennis Dorn also claim that the trial court abused its discretion in failing to hold a mid-trial hearing to explore whether a juror had indicated hostility toward drug offenders generally. We will address each of these claims in turn.

### III.

### Sufficiency of the Evidence

We must determine whether, in the light most favorable to the government, a reasonable trier of fact could find that the evidence established guilt beyond a reasonable doubt as to each appellant. *United States v. Vera,* 701 F.2d 1349, 1357 (11th Cir.1983); *see Glasser v. United States,* 315 U.S. 60, 80, 62 S.Ct. 457, 469, 86 L.Ed. 680 (1942).

All reasonable inferences from the evidence must be drawn in favor of the jury's verdict. *United States v. Johnson,* 713 F.2d 654, 661 (11th Cir.1983). A reversal is in order only if 'the evidence, viewed in the light most favorable to the Government, is such that a reasonably

---

(1) to manufacture, distribute, or dispense, or possess with intent to manufacture, distribute, or dispense, a controlled substance[.]
Title 21 U.S.C.A. § 963 (1981) provides:
Attempt and conspiracy
Any offense defined in this subchapter is punishable by imprisonment or fine or both which may not exceed the maximum punishment prescribed for the offense, the commission of which was the object of the attempt or conspiracy.
Title 21 U.S.C.A. § 960 (1981) provides in relevant part:
§ 960. Prohibited Acts A
Unlawful Acts
(a) Any person who—
(1) contrary to section 952, 953, or 957 of this title, knowingly or intentionally imports or exports a controlled substance,
(2) contrary to section 955 of this title, knowingly or intentionally brings or possesses on board a vessel, aircraft, or vehicle a controlled substance, or
(3) contrary to section 959 of this title, manufactures or distributes a controlled substance,

shall be punished as provided in subsection (b) of this section.

**7.** Title 18 U.S.C. § 2 (1982) provides:
§ 2 Principals
(a) Whoever commits an offense against the United States or aids, abets, counsels, commands, induces or procures its commission, is punishable as a principal.
(b) Whoever willfully causes an act to be done which if directly performed by him or another would be an offense against the United States is punishable as a principal.
Title 21 U.S.C.A. § 952(a) provides:
Importation of controlled substances
Controlled substances in schedules I or II and narcotic drugs in schedules III, IV, or V; exceptions
(a) It shall be unlawful to import into the customs territory of the United States from any place outside thereof (but within the United States), or to import into the United States from any place outside thereof, any controlled substance in schedule I or II of subchapter I of this chapter, or any narcotic drug in schedule III, IV, or V of subchapter I of this chapter ....

minded jury *must* have a reasonable doubt as to the existence of the essential elements of the crime charged.' *United States v. Barrera*, 547 F.2d 1250, 1255 (5th Cir.1977) (emphasis in original). The government need not prove that the facts of the case are inconsistent with the defense's theory of the case. The jury is free to choose among alternative reasonable constructions of the evidence. *United States v. Bell*, 678 F.2d 547, 549 (5th Cir. Unit B 1982) (*en banc*), *aff'd on other grounds*, 462 U.S. 356, 103 S.Ct. 2398, 76 L.Ed.2d 638 (1983).

'To support a conviction of conspiracy, the government must prove that an agreement existed between two or more persons to commit a crime and that the defendant knowingly and voluntarily joined or participated in the conspiracy.' *Vera*, 701 F.2d at 1357. For the government to prevail on a charge of possessing, the possession need not be actual, but may be constructive; nor need it be exclusive, it may be shared. *United States v. Marx*, 635 F.2d 436, 440 (5th Cir. Unit B 1981). Intent to distribute may be inferred from the amount of cocaine involved. *United States v. Grayson*, 625 F.2d 66, 67 (5th Cir.1980).

*United States v. Sarmiento*, 744 F.2d 755, at 761 (11th Cir.1984). "In order to prove that a defendant imported controlled substances in violation of 21 U.S.C.A. § 952(a), the government must establish that the defendant imported such substances 'into the United States from any place outside thereof.' *United States v. Miranda*, 593 F.2d 590, 596 (5th Cir.1979). Proof of that element may be by circumstantial evidence. *Id.* at 596–97." *United States v. Phillips*, 664 F.2d 971, 1033 (5th Cir. Unit B 1981). To convict for aiding and abetting, in violation of 18 U.S.C.A. § 2, it is enough that a person "willfully associates himself in some way with the criminal venture and willfully participated in it as he would in something he wished to bring about." *United States v. Barker*, 735 F.2d 1280, 1281 (11th Cir.1984) (quoting *United States v. Phillips*, 664 F.2d 971, 1010 (5th Cir. Unit B 1981), *cert. denied*, 457 U.S. 1136, 102 S.Ct. 2965, 73 L.Ed.2d 1354 (1982).

1. George Garcia

■ Garcia was convicted of conspiracy to possess with intent to distribute and conspiracy to import marijuana. Garcia contends that as the only evidence in the record regarding him is that he made a telephone call to Jerome Brown and was later seen in a camper at the Bell Bluff Campground, such evidence is insufficient basis to prove that he knew the "Gigi" would be used to import marijuana into the United States, or that he knew or participated in any scheme to distribute the marijuana.

More than enough evidence exists from which a reasonable jury could have concluded that Garcia was a participant in the conspiracies to import and to possess with intent to distribute. Garcia's participation in the importation scheme is borne out principally by his telephone call to Brown asking that Brown locate a "car." Garcia concedes that "car" does mean boat, but argues that he did not know that the "Gigi" was to be used to import the marijuana. Far more circumstantial evidence exists, however, linking Garcia to the importation activity. Brown testified that the smugglers needed a small boat which could navigate the narrow and shallow passage of the Sapelo Sound and the inland waterway. Further, Brown was aware that the boat was to be used to import marijuana. Accordingly, Brown took Evasio Garcia to inspect the boat to see whether it would be useful in furthering the importation objectives. The next day, Wednesday, the 25th, Brown accompanied Cejas on a shopping expedition to pick up canvas tops to cover the marijuana while on the "Gigi." George Garcia met with Evasio Garcia, Cejas, and Taute at Brown's house immediately after Brown had driven the "Gigi's" crew to the dock. To this point, the jury could have reasonably concluded that (1) George Garcia was interested in purchasing a boat; (2) the individual whom he asked to locate the boat was involved with other persons in securing equipment to be used in marijuana importation; (3) George Garcia met with other persons who were involved in preparing

the "Gigi" for the importation effort. Brown also testified that George Garcia was given the code name "Sunshine" to be used while broadcasting over the walkie-talkies by the offloading crew and the other on-land participants in the importation scheme. A reasonable jury, therefore, could have found that George Garcia was a co-conspirator in the importation scheme.

Similarly, a reasonable jury could have found that George Garcia was also a co-conspirator in the distribution scheme. In addition to the evidence above, of particular note is his having received a code name for the use of the walkie-talkies and his presence in the camper at Bell Bluff Campground. The code name connects him to the purpose of the facilitation of the offloading of the imported marijuana. Further, George Garcia's presence in the camper is not mere presence in a climate of suspicious activity. Agent Craig testified that as he approached the camper, he heard radio traffic to the effect that "Charlie's got company ... the monkeys are out." No one suggests that the coded message meant any less than that the police were getting close to "Charlie," the code name for Saunds. George Garcia was inside the camper at the time this warning came over the walkie-talkies. Given the other evidence of Garcia's involvement with procurement of the "Gigi," his conference with other persons involved in the importation and distribution scheme, the existence of a code name especially for Garcia to be used in communicating on the walkie-talkies, and his presence in the camper at the time the warning was broadcast over the walkie-talkies, a reasonable jury could have concluded that George Garcia was a conspirator in the on-land distribution scheme.

### 2. Miguel Falcon

■ Miguel Falcon was convicted of importation of marijuana. He contends that insufficient evidence exists to show that he had either the intent to participate in the importation or knowledge of the illegality of the actions of those around him. Falcon notes that the only evidence of his conduct prior to his boarding the "Gigi" was his association with Brown. While aboard the "Gigi" he was unable to speak to anyone on the boat. He reasons that the only appropriate inference regarding his role in the importation scheme is that Falcon knew nothing of the importation prior to the rendezvous of the mother ship. Once the rendezvous was effected, "disassociation was impossible."

Even assuming that the only evidence supporting Falcon's conviction for importation derives from his activities on the "Gigi," such conviction was the conclusion of a reasonable jury. While Falcon did not speak with the other crew members of the "Gigi," he, first, waited in the hold of the "Gigi" and, second, assisted with the loading of the bales of marijuana into the hold of the "Gigi." Falcon does not claim that he was coerced into loading the marijuana into the "Gigi." His participation was a voluntary and knowing act, and as such, was the kind of activity specifically proscribed by the importation statute.

### 3. Jon Taute

■ The jury convicted Jon Taute of conspiracy to import and conspiracy to possess with intent to distribute. Taute argues that insufficient evidence existed to convict him for conspiracy to import or to convict him of conspiracy to possess with intent to distribute.

The cumulative effect of the circumstantial evidence belies Taute's contention of insufficiency. As to his involvement in the importation, there is Brown's testimony that Taute and another individual carried the "lead boat" to Harris Neck Dock. This boat was to be used to meet the "Gigi" and direct it to the offload site after it was loaded with marijuana. Saunds testified that he met Taute and another man at the Eulonia intersection at which time Taute had a truck and the speedboat. Just prior to that meeting, Saunds had met with Cejas at which time he received instructions on which channel on the hand-held radio he was to use to communicate with the speedboat when he reached the Sound. Brown was also at this meeting at the Eulonia intersection. It was Brown, a key partici-

pant in the conspiracies, who spoke with Taute and the other person. Finally, Taute admitted to Saunds, while they were both in the Glyn County Jail, that Taute had been in the speedboat at the time that the "Gigi" was seized in the channel.[8] From this evidence alone, a reasonable jury could have concluded that Taute was a willing participant in the importation scheme.

The evidence as to the conspiracy to possess with intent to distribute is also sufficient. Taute argues that no evidence exists of his having exercised dominion or control over the marijuana, and, therefore, he could not be reasonably convicted of conspiracy to import with intent to distribute. The charge on which he was convicted was *conspiracy* to import with intent to distribute. As this circuit has found, "possession can be either actual or constructive. Constructive possession of contraband may be shown by proof of dominion and control over a vehicle containing contraband." *United States v. Clark*, 732 F.2d 1536, 1540 (11th Cir.1984) (citing *United States v. Brunty*, 701 F.2d 1375, 1382 (11th Cir. 1983). Possession by one co-conspirator can be imputed to another. *Clark*, 732 F.2d at 1540. As a result, if evidence exists that any of the co-conspirators possessed the marijuana with intent to distribute, such possession can be imputed to Taute. *United States v. Newbern*, 731 F.2d 744, 750 (11th Cir.1984). The jury could have found Saunds's acts of possession to be imputed to Taute, a co-conspirator. In addition, a jury could reasonably have found an intent to distribute based on the possession of 28,000 pounds of marijuana. *United States v. Ceballos*, 706 F.2d 1198, 1202 (11th Cir.1983); *United States v. Miller*, 693 F.2d 1051, 1054 (11th Cir. 1982). The conviction of Taute for conspiracy to import and conspiracy to possess with intent to distribute was supported by substantial evidence.

### 4. Evasio Garcia

■ The jury convicted Evasio Garcia of conspiracy to import and conspiracy to pos-

sess with intent to distribute. Garcia characterizes the evidence regarding him as mere presence in a suspicious climate of activity. Garcia reasons that his inspection of the "Gigi" to determine its seaworthiness is consistent only with the conclusion that he was a surveyor of the boat for Brown. Further, his presence at Brown's home after the inspection, as well as his presence in the car parked near the driveway of Brown's house contemporaneous with the boarding of the "Gigi" by government agents, is insufficient to support a conclusion of conspiratorial intent. The government argues that Garcia "inspected the "Gigi" to ascertain if it suited the smugglers' needs." Further, the government attributes to Garcia participation in the "arrangements to dispose of their cargo."

We find that the evidence was insufficient for a jury to conclude that Evasio Garcia was guilty of conspiracy to import and conspiracy to possess with intent to distribute. The relevant acts of Evasio Garcia are his inspection of the "Gigi," his presence at a meeting of Cejas, George Garcia, Taute, and one other person, and his presence in a vehicle with Taute near Brown's driveway. His acts differ substantially from those of the other appellants. He has not been connected to instrumentalities of the distribution and importation schemes such as would have suggested that he was a conspirator. In this regard, he is unlike George Garcia who had a special code name for use of the walkie-talkie and used a telephone to ask Brown to locate a shrimp boat. He is unlike Falcon, Kelly, and Dennis Dorn who were on the boat loading the marijuana; and he is unlike Jon Taute who was on the lead boat and admitted that he was part of the importation and distribution scheme. As Garcia argues, all the record shows is that he was an acquaintance of Brown. The more reasonable inference from Garcia's acts in this case are that Brown requested that Garcia inspect the boat without making him aware

---

**8.** Taute makes a separate claim concerning the admissibility of these statements. We discuss this issue further in the Fourth and Sixth Amendments portion of this opinion.

of its ultimate purpose. As well, Garcia could have been present in Brown's house as a social guest. No evidence exists that the affairs of the importation and distribution schemes were discussed with Evasio Garcia. Finally, his presence in the car in the early hours of November 28 is mere presence. No inference of guilt can be reached based on his prior acts. A reasonable jury could not conclude that Evasio Garcia was a co-conspirator in the importation and distribution schemes. Accordingly, insufficient evidence exists to sustain the jury's verdict of guilty of conspiracy to import and conspiracy to possess with intent to distribute.

### 5. John Kelly and Dennis Dorn

■ Neither Kelly nor Dorn have raised sufficiency of the evidence claims before this court. While ordinarily we would not address a claim not raised, "a reversal for insufficient evidence would preclude a retrial." *United States v. Romano,* 736 F.2d 1432, 1439 (11th Cir.1984). *See Hudson v. Louisiana,* 450 U.S. 40, 101 S.Ct. 970, 67 L.Ed.2d 30 (1981). Accordingly, therefore, the sufficiency of the evidence claims with respect to Kelly and Dorn will be addressed.

The jury convicted Kelly and Dorn of conspiracy to import and importation, conspiracy to possess with intent to distribute, and possession with intent to distribute. Sufficient evidence existed for the jury to conclude that Kelly and Dorn were integrally involved in the importation scheme. Brown drove Kelly and Dorn to the dock. Both men boarded the "Gigi" and assumed their respective roles. Kelly acted as a supervisor, giving the pilot, Saunds, instructions as to how long to wait for the mother ship, and receiving from Saunds navigation readings with respect to their proximity to the rendezvous point. Dorn was responsible for staying on deck and

passing the bales of marijuana to Falcon who was down in the hold of the "Gigi." As well, Dorn and Kelly were seen near the camper at the Bell Bluff Campground a day before the operation began. Given this quantum of contact with the importation scheme, a reasonable jury could conclude, first, that Kelly and Dorn had possession of the marijuana and, second, that given the quantity of the marijuana imported, an intent to distribute existed. Accordingly, sufficient evidence existed for the jury to conclude that Kelly and Dorn were guilty of the conspiracy and the substantive charges.

### Fourth and Sixth Amendments

Taute and Evasio Garcia claim that the court committed error in admitting evidence that Garcia and Taute were seen by Agent Swygert near Brown's driveway, and by admitting incriminating statements made by Taute to Saunds.

■ They argue, first, that the identification of Garcia and Taute was derived from an admittedly illegal arrest and, as such, should have been excluded as fruit of that illegal arrest. The trial court, during the suppression hearing, found that Agent Swygert's observation of Garcia and Taute was "independent" of the arrest and, thus, was not tainted by its illegality. We agree. Agent Swygert observed Garcia and Taute in the car *before* he arrested them. While Agent Swygert lacked probable cause to arrest Garcia and Taute, he, nonetheless, had authority to stop the car and ask the occupants to identify themselves. As a result, therefore, the agent could properly testify to seeing Garcia and Taute in the car on November 28.

Taute next argues that incriminating statements made by him to Saunds were improperly admitted as fruit of the illegal arrest and, as the product of a government interrogation in violation of his right to counsel.[9] The trial court fully evaluated

---

9. At trial, Evasio Garcia's lawyer, Clark, objected to Saunds's testimony regarding the statements of Jon Taute made at the Glyn County Jail. Clark reasoned that such statements were hearsay and were inadmissible as statements of co-conspirators because the conspiracy had ended at the time Taute was in jail. Without determining whether the conspiracy had, indeed, ended and absent any objection from the government, the trial court ruled that Saunds's testimony as to Taute's statements would be admissible only as to Taute and not to any of the other defendants. A limiting instruction was given to the jury.

Taute's claims with respect to the inadmissibility of the incriminating statements. It held, as do we, that such statements were neither tainted by the illegal arrest, nor were they obtained in violation of Taute's right to counsel.

### Motion for Continuance

 Kelly and Dorn make three claims arising from the court's denial of Kelly's motion for a continuance. Kelly claims the trial court abused its discretion in denying his motion for a continuance; both Kelly and Dorn make separate claims that the status of Ryland, original counsel for Kelly, Dennis Dorn, and John Dorn, as an object of a continuing criminal investigation, denied Dorn and Kelly their rights to conflict-free assistance of counsel, due process, and fundamental fairness. On review of the record, we find that (1) the trial court did not abuse its discretion in denying Kelly's motion for continuance for change of counsel and (2) that Kelly and Dorn's rights to conflict-free assistance of counsel, due process, and fundamental fairness were not violated.

On February 5, the Saturday before trial, Ryland, Kelly's lawyer, told the court that Kelly intended to retain a new lawyer. When questioned by the court about his reasons for desiring to change lawyers, Kelly answered that (1) he was upset that Ryland had failed to warn him that the newspaper would print his suppression hearing testimony admitting that he was an offloader of the "Gigi"; and (2) that he also objected to Ryland's failure to object to Kelly's being asked to "point other people out." When the trial began that Monday, Steve Kermisch, a lawyer, appeared representing Kelly. At that time, Kermisch made a motion for a continuance. Kermisch intimated that some conflict between Ryland and Kelly existed:

> There was a book found in the trailer, the camper, that had someone's—Mr. Ryland's name was in it, and I think that Mr. Kelly and someone felt responsible for that, felt he had to take the stand. I'm not sure there wasn't some pressure of some of those things on Mr. Kelly that perhaps we are getting close to conflict,

and I don't think the appearance of that should even be given.

This was the first suggestion of a possibility that a conflict of interest existed between Kelly and Ryland. The court denied the motion. The next day, Ryland informed the court that he had just recently learned that he was a "target" of the government's investigation. This was because a book containing a magazine subscription form had been filled out in the name of a woman with a last name of "Ryland," an airline ticket receipt for a flight from Miami, Florida, to Savannah, Georgia, on November 25, 1982, revealed an address which was Ryland's law office, and a gun which Ryland had given Cejas as a gift were all found in the camper pursuant to the arrest and searches in this case. Ryland was made aware, however, of the existence of these personal items as early as December 28, 1982, at a discovery conference. The government agent in charge of the continuing investigation into the marijuana operation testified that although Ryland was a "potential target" in this investigation, there was not enough evidence to bring an indictment. Ryland asked for a brief continuance during which he asked his clients, Dennis Dorn and John Dorn, whether they wanted him to continue as their counsel. Both expressed their desire to have him continue to represent them. In addition, in response to a question put to him by the court, Ryland stated that he was not "intimidated" by the government's suspicions.

These proceedings do not indicate that the court abused its discretion in denying the motion for a continuance, or that Kelly and Dorn's right to conflict-free assistance of counsel was violated. When the motion for a continuance was formally made at trial on the first day, Kermisch did not provide the court with any more information than that provided the trial court during the suppression hearing. Although Kermisch made some intimation that conflict of interest might exist between Ryland and Kelly, he did not elaborate nor press that contention. The substance of the motion, therefore, was a request for time for

new counsel to prepare because Kelly differed with Ryland's strategy during the suppression hearing. Ryland's revelation on the next day, that he was a "target," was not such compelling evidence of his inability to provide effective assistance that the trial court's failure to grant the motion for a continuance after that revelation was an abuse of its discretion. Indeed, much suggests that the timing of the revelation may have had as its object the delay of the trial. Ryland knew in December, 1982, that personal items seized in the marijuana investigation suggested a possible connection with the marijuana importation-distribution scheme. Further, the decision by Dennis Dorn and John Dorn to retain Ryland as their lawyer undercuts any assertion that they felt intimidated by Ryland's revelations. As to Kelly, neither he nor Kermisch made a specific objection of ineffective assistance of counsel relating to Ryland's ability to have performed adequately in the past.[10] We hold that the trial court did not abuse its discretion in denying Kelly's motion for a continuance.

Dennis Dorn claims for the first time on appeal that his right to conflict-free assistance of counsel was violated because of Ryland's status as an object of the government's investigation. Even though Dennis Dorn was given an opportunity to raise a conflict free assistance claim during trial, he declined to do so, thereby, suggesting that he was satisfied with both Ryland's past assistance and Ryland's ability to render such effective assistance throughout the trial. As this claim was not made at trial, it is not reviewable for the first time before this court. *See Harden v. United States,* 688 F.2d 1025, 1032 (5th Cir. Unit B 1982); *Brookhaven Landscape & Grading Co., Inc. v. J.F. Barton Contracting Co.,* 676 F.2d 516, 523 (11th Cir.1982).

### Juror Bias

 Kelly and Dennis Dorn contend that the court abused its discretion in failing to hold a hearing to examine juror bias. They contend that it was not enough for the trial court to hold a hearing in which a member of the venire testified to jury statements of bias. They argue that the jurors should have been individually questioned to determine whether they were influenced by the statements made. Because credibility determinations are within the sound discretion of the trial court, the trial court did not abuse its discretion in finding that the dismissed juror's claims of jury hostility and bias were not credible.

Towards the end of the trial, Kermisch informed the court that a member of the venire who had not been selected for the jury reported to him a conversation of venire persons indicating jury bias. Bruce McDonald testified that at a lunch of prospective jurors, one person stated "if it was a black male raping a white lady, or if it was a drug trial, they should take them out back and shoot them."[11] The others at the table nodded their agreement. McDonald, however, could not state that the juror making the statement had been selected, but he did indicate that a member of the current jury had stated that "he was opposed to drugs." The court found McDonald's testimony to be incredible.

THE COURT: [I] do not find this witness worthy of belief. He is too biased. He has already compromised himself so many times. Even assuming that conversation was had, there was no indication to show that the people were any-

---

10. The government suggests that to the degree that the conflict-free assistance of counsel claim was raised during the motion for a continuance, that claim was not a valid objection raised at trial and, therefore, was not reviewable on appeal. We do not decide that issue because, to the degree that an objection was made as to the right to conflict-free assistance of counsel, the court did not abuse its discretion in denying the motion for a continuance and, thereby, rejecting the claim that Kelly and Dorn's right to conflict-free assistance was violated.

11. McDonald was disqualified from being eligible for jury selection because he had been recently arraigned in state court on a drug charge. In addition, examination of McDonald during this hearing revealed that (1) he was favorably disposed towards marijuana; (2) he was a good friend of Kelly's wife; (3) his car had been searched and taken apart by Agent Swygert, the case agent at this trial, who had thought that McDonald was "hauling something" illegal; and (4) he, nonetheless, bore no grudge or ill will against Agent Swygert.

thing—or the person who made the statement, and the acquiescence in it, according to this witness, by the other people who were at the table had nothing—they demonstrated nothing but being against what the law also abhors, that is rape. Of course, they gave the connotation of it being in the racial context. And, also against drugs. Obviously, the law does prohibit each one of them.

What we are seeking, of course, is someone who comes into court honestly and fairly, and who will agree to try it. Over and over, a member of a panel has been questioned [whether] he [is] against whatever is being charged, and if he says yes, that certainly does not disqualify him. It only disqualifies him if he says he cannot be fair and impartial because of the magnitude of his offense to that particular charge.

It is within the trial court's discretion to question jurors about alleged bias, *United States v. Yonn*, 702 F.2d 1341 (11th Cir. 1983). As McDonald's testimony was found to be incredible, the trial court did not abuse its discretion in failing to hold a separate hearing in which it would interrogate jurors as to their bias. *See, e.g., United States v. Barshov*, 733 F.2d 842 (11th Cir.1984).

### Motion for Continuance and for Substitution of Counsel

■■■■ At oral argument, the panel was made aware, prior to the call of the calendar, that a motion for continuance and for substitution of counsel was to be made in this case. Frank Petrella, counsel of record for John Kelly and Dennis Dorn, hand-delivered a letter to this court indicating that as of the close of business on October 30, 1984, John Kelly filed a pro se motion for a continuance. The letter also stated that Dennis Dorn telephoned Petrella that evening and advised him that he was "no longer to represent his interests in this case in any manner." Prior to the call of the calendar, the court questioned Petrella about his hand-delivered letter and about the pro se motion for continuance and substitution of counsel filed by Ester

Kelly on behalf of John Kelly.[12] When questioned about this matter, Petrella asked the court to agree to the substitution of counsel request made by Dennis Dorn to Petrella by telephone. The court agreed, but asked that Petrella remain at the proceeding during oral arguments. Ester Kelly's motion for continuance, however, was denied as being both untimely and presenting claims more appropriate in a collateral proceeding.

The motion for continuance asked for a ten-day delay on grounds which include:

1. The failure of Mr. Petrella to bring all issues on appeal.
2. Failure of counsel to follow instructions given by Kelly.
3. Prejudice caused by the fact that other trial counsel, Stephen Kermisch, was part of a witness protection program and as a result access to files relative to this case in Kermisch's custody was not possible.
4. Mr. Kermisch was an agent for the United States from 1980 through 1983.

We note, first, that the motion for continuance is directed at postponing oral argument. Kelly does not have a right to oral argument. The decision to schedule oral argument is in the discretion of the court. *See* 11th Cir.R. 23 and 24. In addition, we find that this motion for continuance is untimely. The grounds for the motion for continuance and substitution of counsel were known to Kelly well before the scheduling of oral argument. *See United States v. McDonald*, 672 F.2d 864 (11th Cir.1982). In addition, Kelly's claims regarding Petrella's performance in handling the trial and the appeal are more appropriately addressed in a collateral proceeding. We hold, therefore, that Kelly's motion for a continuance and for substitution of counsel is frivolous and, therefore, will not be addressed by this court. *See* 11th Cir.R. 18.

### Conclusion

For the foregoing reasons, we conclude that the claims of George Garcia, Miguel Falcon, Jon Taute, John Kelly, and Dennis

---

**12.** We assume that Ester Kelly is the authorized agent of John Kelly.

Dorn are all without merit. Their convictions are affirmed. Evasio Garcia's claim, however, has merit. His conviction is reversed.

AFFIRMED IN PART and REVERSED IN PART.