[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 11-14979
Non-Argument Calendar
_____

D.C. Docket No. 1:10-cr-20171-JLK-3


UNITED STATES OF AMERICA,

Plaintiff - Appellee,

versus

TERRI L. DECUBAS,
FEDERICO M. FERMIN,

Defendants - Appellants.


_____

Appeals from the United States District Court
for the Southern District of Florida
_____

(February 8, 2013)

Before WILSON, MARTIN and ANDERSON, Circuit Judges.

PER CURIAM:

The Appellants, Terri L. Decubas and Federico M. Fermin, challenge the sufficiency of the evidence supporting their convictions for conspiracy to distribute prescription drugs wholesale without a license, in violation of 18 U.S.C. § 371 and 21 U.S.C. §§ 331(t), 333(b)(1)(D), and 353(e)(2)(A).  In addition, Fermin argues that his sentence for conspiracy violated *Apprendi v. New Jersey*, 530 U.S. 466, 120 S. Ct. 2348 (2000), because the court failed to include "knowingly" in the jury instructions for the substantive offense.  Finally, Decubas argues that her conspiracy conviction should have been treated as a misdemeanor.

We conclude, first, that the prosecution's evidence was sufficient to support both appellants' convictions; second, that the district court's failure to include "knowingly" in the substantive offense's jury instructions was not plain error; and finally, that the district court did not err by treating Decubas's conviction as a felony.  The convictions are affirmed.

## I.  FACTUAL BACKGROUND

In April 2002, Florida drug agents raided the warehouses of Jemco Medical International, Inc. (Jemco), a Broward County business licensed by the state of Florida to distribute prescription drugs wholesale.  Jose Castillo, who was charged alongside Decubas and Fermin, was Jemco's owner and operator.  Decubas and Fermin worked in managerial positions under Castillo.  Inside one of Jemco's warehouses, agents found three offices—two with computers, and one with boxes

2

of pharmaceuticals, lighter fluid, sponges,[1] outserts,[2] and handwritten lists of pharmaceuticals. In an adjoining, non-air-conditioned[3] space, agents found hundreds of bottles of medicine valued at approximately $3.5 million.[4] Several bottles were marked with a handwritten "M," which indicated that Florida's Medicaid program had paid for the drugs. Jemco did not have a license to store prescription drugs in that specific warehouse, and Castillo could not provide the agents with any paperwork showing the drugs' purchase. Jemco subsequently lost its license to distribute wholesale prescription drugs, and closed its doors. Fermin and Decubas were aware that Jemco had been raided by drug agents.

Within a few weeks, Castillo opened Kirby Health Care Distributors (Kirby), and Meridian Health Care Distributors (Meridian) at an office in Weston, Florida. Decubas was the nominal owner of Meridian, but both she and Fermin apparently worked under Castillo's supervision. Despite being the undisputed boss, Castillo made sure that his now-tainted name did not appear on the corporate records of either Kirby or Meridian. Gloria Gutierrez, a former Jemco receptionist

---

[1] Lighter fluid and sponges are often used to remove the sticky residue left behind from a pharmacy's dispensing label on a container of medicine.

[2] An "outsert" is multi-folded instruction sheet attached to the outside of a medicine bottle.

[3] Florida statutes require licensed wholesalers to store their drugs in an air-conditioned space.

[4] Some of the drugs discovered by agents in the adjoining warehouse included Zyprexa (treatment for schizophrenia and bipolar disorder), HIV antiretrovirals (drugs that restrain the growth of the HIV virus), Albuterol (treatment for asthma), and Ipratropium (treatment for asthma).

who followed Castillo to the Kirby/Meridian office, testified that Fermin and Decubas made it explicitly clear to the entire workforce that Castillo was not supposed to be in the Weston office, and that under no circumstance was his involvement in the office to be disclosed.

Kirby and Meridian were in the business of soliciting orders for medicine from pharmacies. When Kirby or Meridian made a sale, the order would be transmitted to Pharmacy Distributors Group (PDG), a Castillo-run company in Boerne, Texas. PDG, a licensed pharmacy distributor, fulfilled the Kirby/Meridian sales by shipping the drugs from Boerne to the pharmacies. PDG's inventory of drugs arrived with an invoice either inside the box, or faxed from Meridian/Kirby. The invoices often indicated that the drugs had been purchased from Island Pharmaceuticals, a sham Puerto Rican distributor. The boxes of drugs arrived with a return address for Swift Freight Services (Swift Freight), a purportedly Tennessean company incorporated by Jesus Romero, a south Floridian who is married to Castillo's niece. Fermin and Decubas had offered Romero a monthly payment of $300 for the use of his name on Swift Freight's books. After Romero agreed, Fermin opened a Pak Mailbox for Swift Freight in Tennessee, using a Florida address to do so. Both Fermin and Decubas wrote checks to Romero for the use of his name, with the money coming from Castillo.

4

The net effect of Castillo's new scheme was that drugs shipped from south Florida to Texas appeared to have come from Tennessee. PDG then shipped the drugs to pharmacies nationwide, which in turn made payments to PDG. PDG distributed $13 million in pharmacy payments to ten sham companies by check, all of which were cashed at two check-cashing stores in Miami. Fermin and Decubas signed several of PDG's checks to the sham companies. In other words, it was business as usual for Castillo, albeit with a decidedly more byzantine paper trail.

In September 2004, the Food and Drug Administration (FDA) subpoenaed PDG's records to ascertain its suppliers and customers. PDG provided the FDA with a list of suppliers and copies of invoices. The "supplier" owners unanimously testified that they had never sold drugs to PDG, and that the invoices were fake. During a raid at the Kirby/Meridian office, FDA agents found copies of the fake invoices on Fermin's computer. And, in keeping with Jemco's protocol, the Kirby/Meridian office was well-stocked with "M"-marked bottles, bottles with lighter-fluid residue, and bottles with faded lot numbers.

During the FDA's raid of the Kirby/Meridian office, Decubas stated that there were no drugs at the office whatsoever, only medical and surgical supplies. She stated that Kirby/Meridian was not involved in the pharmaceutical business. Decubas also told an FDA agent that she was not sure how documents relating to pharmaceutical sales and invoices had gotten into her office.

5

## II.  PROCEDURAL BACKGROUND

Fermin and Decubas were charged with multiple counts, among them conspiracy to distribute prescription drugs wholesale without a license, in violation of 18 U.S.C. § 371 and 21 U.S.C. §§333(b)(1)(D), 353(e)(2)(A), and 331(t) (Count V); and the unlicensed wholesale distribution of prescription drugs, in violation of 21 U.S.C. § 333(b)(1)(D), 353(e)(2)(A), 331(t), and 18 U.S.C. § 2 (Counts VI–VIII).  The jury found Fermin and Decubas guilty of conspiracy to distribute drugs without a license.  With regard to Counts VI–VIII, Decubas was found not guilty, and the jury failed to reach a verdict for Fermin.  Both parties moved for an acquittal of their conspiracy convictions, which the district court denied.  This appeal followed.

## III. ANALYSIS

### A.  Sufficiency of the Evidence

We review *de novo* the district court's denial of a motion for acquittal based on sufficiency of the evidence, "viewing the evidence in the light most favorable to the government and drawing all reasonable inferences in favor of the verdict." *United States v. Schier*, 438 F.3d 1104, 1107 (11th Cir. 2006).  The jury's verdict "*must* be sustained if there is substantial evidence to support it."[5]  *United States v.*

---

[5] Some commentators have pointed out a possible inconsistency in our circuit's conspiracy jurisprudence regarding sufficiency challenges. *See* Julia N. Sarnoff, *Federal Criminal Conspiracy*, 48 Am. Crim. L. Rev. 663, 672–73 (2011).  The inconsistency is this: after

6

*Siegelman*, 640 F.3d 1159, 1164–65 (11th Cir. 2011) (per curiam) (emphasis added) (citing *Glasser v. United States*, 315 U.S. 60, 80, 62 S. Ct. 457, 469 (1942)), *cert. denied*, 132 S. Ct. 2712 (2012).  Put another way, we will only reverse a verdict if the record demonstrates a lack of evidence from which a jury could find guilt beyond a reasonable doubt.  *See United States v. Garcia*, 405 F.3d 1260, 1269 (11th Cir. 2005) (per curiam).  The Supreme Court has warned the circuit courts that "appellate reversal on grounds of insufficient evidence . . . will be confined to cases where the prosecution's failure is clear."  *Burks v. United States*, 437 U.S. 1, 17, 98 S. Ct. 2141, 2150 (1978).

To prove that Fermin and Decubas participated in a conspiracy, the prosecution needed to prove beyond a reasonable doubt, "even if only by circumstantial evidence, that a conspiracy existed" and that Fermin and Decubas "knowingly and voluntarily joined the conspiracy."  *Garcia*, 405 F.3d at 1269.

the government proves the existence of a conspiracy beyond a reasonable doubt, must the government prove that the defendant's connection to the conspiracy was "slight" or "substantial"?  *Compare United States v. Baker*, 432 F.3d 1189, n.49 (11th Cir. 2005) (noting that this circuit occasionally applies an erroneous "slight evidence" standard instead of a "substantial evidence" standard), *with Garcia*, 405 F.3d at 1270 ("Once the existence of a conspiracy is established, only slight evidence is necessary to connect a particular defendant to the conspiracy." (internal quotation marks omitted)).  We need not resolve this issue today, because we conclude that there is at least substantial evidence connecting Fermin and Decubas to the conspiracy.

As an aside, it is probably a distinction without a difference.  Regardless of whether the connection is "slight" or "substantial," the evidence will be sufficient so long as the trier of fact *could*—among competing alternative conclusions—find guilt beyond a reasonable doubt.  *See Baker*, 432 F.3d at 1231–32; *Garcia*, 405 F.3d at 1269 ("We must affirm the appellants' convictions *unless, under no reasonable construction of the evidence*, could the jury have found the appellants guilty beyond a reasonable doubt." (emphasis added)).

7

The prosecution need not prove that a defendant "knew all of the detail or participated in every aspect of the conspiracy." *Id.* at 1270. Instead, the prosecution must prove that the defendants "knew the essential nature of the conspiracy." *Id.* (internal quotation marks omitted).

We have consistently held that, owing to the crime's predominantly mental composition, a defendant's conscious participation in the scheme may be proven by circumstantial evidence. *See id.* (citing *United States v. Pineiro*, 389 F.3d 1359, 1369 (11th Cir. 2004)). And while not controlling, "presence and association are material and probative factors that a jury may consider in reaching its verdict." *United States v. Lluesma*, 45 F.3d 408, 410 (11th Cir. 1995).

The essential nature of this conspiracy was for Fermin and Decubas "to unlawfully enrich themselves by distributing prescription drugs wholesale from the State of Florida to places outside the State of Florida, without being licensed by the State of Florida." Thus, the central question of this appeal is whether the prosecution's circumstantial evidence was so deficient that a jury could not have inferred that Fermin and Decubas knew that Castillo employed them to distribute prescription drugs from Florida without a license.

We begin with the circumstantial evidence that was mutual to Fermin and Decubas: (1) both Fermin and Decubas were aware the Florida drug agents had raided Jemco; (2) both continued to work for Castillo at Kirby/Meridian shortly

8

after Jemco's closing; (3) both told Kirby/Meridian employees not to disclose Castillo's involvement in Kirby/Meridian; and finally, (4) both paid Romero to incorporate Swift Freight in Tennessee, which allowed Castillo to ship prescription drugs to Texas from Florida with a Tennessee return address.  Evidence at trial also showed that Fermin had fake invoices on his Kirby/Meridian computer, that Decubas told FDA agents that Kirby/Meridian only sold medical and surgical supplies, and that Decubas acted bewildered by the pharmaceutical sales and invoices in her office.

In order to have knowledge of the conspiracy's essential nature, Fermin and Decubas had to know that Castillo was shipping prescription drugs out of Florida without a license.  Based upon the foregoing evidence, we conclude that a jury could infer such knowledge beyond a reasonable doubt.  The jury could reasonably infer that Fermin and Decubas knew that Castillo's license had been revoked following the Jemco raid.  This inference is bolstered by the fact that Fermin and Decubas actively concealed Castillo's involvement at Kirby/Meridian.  Finally, the jury could infer from Swift Freight's incorporation, the fake invoices on Fermin's computer, and Decubas's unconvincing explanation of the pharmaceutical documents in her office that Fermin and Decubas were aware that Castillo was shipping prescription drugs from Florida.  Put succinctly, the jury could reasonably conclude that Fermin and Decubas knowingly participated in acts—such as paying

off Romero to incorporate Swift Freight—that would further the conspiracy's purpose, i.e., to sell without a license prescription drugs. We find readily distinguishable the cases cited by Fermin and Decubas, beginning with *Ingram v. United States*, 360 U.S. 672, 79 S. Ct. 1314 (1959).

In *Ingram*, the Supreme Court found the prosecution's evidence for conspiracy to evade taxes insufficient with regard to two lottery employees who allegedly helped to keep the lottery secret from authorities. *Id.* at 680, 79 S. Ct. at 1320. The employees themselves had not conspired to evade taxes; instead, it was the owners of the lottery who had done so. The employees' actions were almost certainly explained by the fact that the lottery was illegal under state law, and evidence that they "might have wanted the taxes to be evaded if they had known of them, and that they engaged in conduct which could have been in furtherance of a plan to evade the taxes if they had known of them, [was] not evidence that they did know of them." *Id. Ingram* stands for the proposition that "charges of conspiracy are not to be made out by piling inference upon inference." *Id.* (internal quotation marks omitted). In this case, unlike *Ingram*, the jury did not have to make enormous inferential steps, but instead inferential tiptoes. Fermin and Decubas were associated with Castillo for years, during Jemco's raid, after Jemco shuttered, and throughout their stints at Kirby/Meridian, all the while telling Kirby/Meridian employees to keep Castillo's involvement in the dark.

10

Fermin's citation to *United States v. Kelly*, 749 F.2d 1541 (11th Cir. 1985), is similarly unconvincing. In *Kelly*, we found that insufficient evidence supported the defendant's conviction for drug smuggling. *Id.* at 1548. In that case, we held that the defendant's inspection of a drug-smuggling boat's seaworthiness, along with his presence at a meeting of co-conspirators, was insufficient to demonstrate knowledge. *Id.* It was unreasonable for the jury to infer that the defendant knew the boat would be used for drug smuggling merely by his inspection of the boat and his acquaintance with the co-conspirators. *Id.* at 1548–49. Were it the case now that the prosecution had presented only "facially innocent act[s]" by Fermin and Decubas, we would be inclined to agree with Fermin. *United States v. Perez-Tosta*, 36 F.3d 1552, 1558 (11th Cir. 1994). However, Fermin had fake invoices on his computer, and Decubas misrepresented the truth to FDA agents, neither of which in our view is a "facially innocent act" like a boat inspection. *Id.*

Finally, Decubas points to our decision in *United States v. Lluesma*, 45 F.3d 408 (11th Cir. 1995). In *Lluesma*, Cruz and Lluesma challenged the sufficiency of the evidence supporting their convictions for conspiracy to export stolen construction vehicles. *Id.* at 409. We rejected Lluesma's sufficiency challenge because the government's circumstantial evidence—such as a co-conspirator's testimony about Lluesma's state of mind—sufficiently supported the jury's determination that Lluesma knew that the vehicles were destined for export. *Id.* at

11

410. Lluesma had also been observed riding around the area in a stolen car with a "piece of bumper sticker cover[ing] a punched out rear door lock." *Id.* at 409. Contrarily, we reversed Cruz's conviction because the prosecution's circumstantial evidence demonstrated that Cruz, an unemployed person, merely performed the occasional odd job for the co-conspirators. *Id.* at 411. Cruz's "odd jobs" included removing the roof of a soon-to-be-exported John Deere tractor and placing a container onto a trailer. *Id.*

We find it obvious that Fermin's and Decubas's roles in the conspiracy are patently unlike Cruz's in *Lluesma*. Fermin and Decubas had been Castillo's managers for years, soliciting sales for PDG and engineering a sham Tennessee corporation to mask the drugs' true origin. They certainly did more than the occasional odd job. Fermin and Decubas are right to suggest that presence alone may not establish knowledge unless "it would be unreasonable for anyone other than a knowledgeable participant to be present." *Id.* at 410. But Fermin and Decubas were not "merely" present at Kirby/Meridian. To reiterate, fake invoices were found on Fermin's computer, and Decubas told the FDA agents that Kirby/Meridian was not engaged in the pharmaceutical business. Moreover, both conspirators concealed Castillo's involvement. Substantial evidence, independent of their presence, supported the jury's conclusion that Fermin and Decubas had knowledge of the scheme.

12

Having dispensed with Fermin and Decubas's sufficiency argument, we turn to the remaining two issues on appeal.

## B.  Fermin's Jury Instructions

Even though Fermin was convicted of conspiracy, he argues that his conviction must be reversed because of an error in a jury instruction for a different count: the substantive offense.  Fermin argues that because the jury instructions for the underlying offense—unlicensed wholesale distribution of drugs—did not contain the word "knowingly," he was prejudiced.  Under *Apprendi*, "any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury." 530 U.S. at 490, 120 S. Ct. at 2362–63.  Because Fermin did not object to the jury instructions at trial, the instructions are reviewed for plain error.  *Montgomery v. Noga*, 168 F.3d 1282, 1294 (11th Cir. 1999).  The error must have been a plainly incorrect statement of law, and it must have resulted in a miscarriage of justice.  *United States v. Prather*, 205 F.3d 1265, 1272 (11th Cir. 2000).

We first note that the jury instructions for Fermin's conspiracy conviction stated: "Count 5 charges that the Defendants knowingly and willfully conspired to distribute prescription drugs wholesale without a license."  The jury was further instructed that the prosecution needed to prove that Fermin and Decubas "knew the unlawful purpose of the plan and willfully joined in it."  Although the substantive

13

offense's instructions did not contain the word "knowingly," we can hardly say that *that* omission engineered a miscarriage of justice when Fermin was convicted of a separate crime, with instructions that adequately explained the requisite *mens rea*.

## C.  Decubas's Jury Instructions

Decubas argues that her conviction should be treated as a misdemeanor because the jury instructions for the conspiracy count did not include an element of fraudulent intent.  Without this element, she argues, her sentence violates *Apprendi*.  *See* 530 U.S. at 590, 120 S. Ct. at 2362–63.  Because Decubas did not object to the jury instructions at trial, we review them for plain error.  *See Noga*, 168 F.3d at 1294.

Decubas appears to have misconstrued the statutes forming the underlying offenses of her conspiracy conviction.  The prosecution alleged that Decubas conspired to violate 21 U.S.C. §§ 331(t), 333(b)(1)(D), and 353(e)(2)(A).  Section 331 provides an extensive list of prohibited acts; one of those acts, listed in § 331(t), is the wholesale distribution of drugs without a license in violation of § 353(e)(2)(A).  Section 333(b)(1)(D) states that violators of § 353(e)(2)(A) "shall be imprisoned for not more than 10 years or fined not more than $250,000, or both."  The phrase "fraudulent intent" is found nowhere in the three statutes.

14

Decubas cites *United States v. Bradshaw*, 840 F.2d 871 (11th Cir. 1988), where the defendant had been convicted under the general penalty provisions of § 333(a), which make all § 331 violations misdemeanors unless they are committed "with the intent to defraud." 21 U.S.C. § 333(a)(2). That argument might hold water if Decubas had been indicted for conspiring to violate § 333(a), but she was indicted under § 333(b), which states: "*Notwithstanding* [§ 333(a)], any person who violates section 331(t) of this title by . . . knowingly distributing drugs in violation of section 353(e)(2)(A) . . . shall be imprisoned for not more than 10 years or fined not more than $250,000, or both." § 331(b)(1)(D). The jury instructions for Decubas's and Fermin's conspiracy convictions, as noted above, more than adequately explained the *mens rea* required for their conspiracy convictions.

## IV. CONCLUSION

The prosecution's evidence was more than sufficient to support the appellants' convictions. In addition, the jury was correctly instructed on the *mens rea* necessary to convict both appellants.

**AFFIRMED.**

15