UNITED STATES of America,
Plaintiff–Appellee,

v.

Jose MUNOZ, Hedo E. Casanga, Juan
Vizcaino, Marcello S. Rengifo–Bacelli,
Dennis J. Lewis, William D. Slappey,
Defendants–Appellants.

UNITED STATES of America,
Plaintiff–Appellee,

v.

Alberto CRUZ, Francisco Rodriguez,
Defendants–Appellants.

Nos. 90–3047, 91–4215.

United States Court of Appeals,
Eleventh Circuit.

March 17, 1994.

**1118**

Ronald Lowy, Law Offices of Ronald S. Lowy, Miami Beach, FL, for Jose M. Munoz.

Clifford B. Hark, Miami, FL, for Hedo E. Casanga.

Michael J. McDermott, Brandon, FL, for Juan Vizcaino.

Kenneth Feldman, Coral Gables, FL, for Marcello S. Rengifo–Bacelli.

David T. Weisbrod, Tampa, FL, for Dennis J. Lewis.

Thomas Findley, Asst. U.S. Atty., Tampa, FL, for U.S. in No. 90–3047.

Daniel M. Hernandez, Tampa, FL, for Ricardo Lugo.

Ricardo Escober, Tampa, FL, for Alberto Cruz.

Joel Defabio, Coral Gables, FL, for Francisco Rodriguez.

Thomas M. Findley, Asst. U.S. Atty., Tamra Phipps, Tampa, FL, for U.S. in No. 91–4215.

Before HATCHETT and EDMONDSON, Circuit Judges, and FRIEDMAN *, Senior Circuit Judge.

* Daniel M. Friedman, Senior U.S. Circuit Judge

FRIEDMAN, Senior Circuit Judge:

These are two consolidated appeals by eight persons from their convictions in the United States District Court for the Middle District of Florida of (1) possession of marijuana with intent to distribute it, in violation of 46 U.S.C.App. § 1903 and 18 U.S.C. § 2, (2) conspiracy to import marijuana, in violation of 21 U.S.C. §§ 963 and 952 and (3) attempted importation of marijuana, in violation of the latter two provisions. The criminal prosecution stemmed from an unsuccessful attempt by the appellants and others to import at least 18,000 lbs. (9 tons) of marijuana from Central America by concealing it aboard a large tugboat that sailed from Mexico across the Gulf of Mexico, and offloading the marijuana at sea about 100 miles west of the coast of Florida into several "fast boats" for transportation to the mainland. The scheme collapsed when a coast guard cutter approached the tugboat during the night time offloading. The tugboat and the fast boats attempted to flee from the cutter. After pursuit, the coast guard apprehended and seized the tugboat and one of the fast boats. Substantial evidence reflecting the appellants' guilt was seized from the tugboat.

The appellants challenge their convictions on a number of grounds, and one of them challenges his sentence. We reject all of these contentions and therefore affirm.

I

There was evidence from which the jury could have found the following facts and drawn the following inferences:

In March 1989, the Turtola, a 105 foot tugboat, sailed from Panama and, after stopping in Mexico, headed for Tampa, Florida. The Turtola's cargo consisted of at least 18,000 pounds of baled marijuana, stacked in a below-deck, false compartment that had been made from the center fuel tank. The Turtola carried no other cargo. It had a crew of six, all of whom were defendants at trial and four of whom are appellants.

On April 5, 1989, the Turtola reached a remote point approximately 100 miles off of the west coast of Florida in the Gulf of

for the Federal Circuit, sitting by designation.

Mexico. The Turtola then met up with several "go fast" boats after 9:00 p.m., and began offloading the marijuana to those boats. The appellant Rengifo–Bacelli, a crewman aboard the Turtola, admitted that he had participated in the offloading.

Shortly after the rendezvous between the Turtola and the go-fast boats, a Coast Guard cutter approached the Turtola, which was well lit with deck and work lights. When the coast guard vessel turned its spotlight on the Turtola, the go-fast boats quickly departed in various directions without lights and at high speeds. A Coast Guard agent conducting aerial surveillance of the scene saw five boats depart from the Turtola, after the Coast Guard cutter turned on its spotlight, including the white boat discussed below. The Turtola attempted to flee.

Another Coast Guard cutter attempted to stop the Turtola. The latter first took evasive action and then attempted to ram the Coast Guard vessel. After the Coast Guard fired shots over the bow of the Turtola, the Turtola stopped.

Coast Guard personnel boarded the vessel and immediately smelled marijuana. They discovered a freshly cut hole, large enough for a man to fit through, in the floor of the mess hall. Next to the hole were concrete and tile chips and a cutting torch. A small package of marijuana was on deck near the hole. The hole led to the false storage compartment made from the fuel tank. The storage area contained 18,000 pounds of bailed marijuana. One side of the storage compartment was filled with marijuana, while the other side was only partially filled with it. The bales were encased in plastic packaging. Coast Guard personnel found and seized a number of other items on the Turtola, including certain bank documents, the admission of which into evidence is discussed in part III of this opinion.

The four fast boats were subject to aerial surveillance from the time they put to sea until they reached the Turtola. Although the surveillance did not constantly keep the boats in view on the radar screens, it did track their courses on radar, and the boats were constantly on radar when in the area around the Turtola. All four boats took the identical course upon leaving Florida heading for the rendezvous point.

There was more detailed evidence about two of the fast boats: a dark blue boat which three of the defendants (the appellants Lewis, Frese, and Slappey) were aboard, and a white boat manned by the defendants Cruz, Lugo, and Rodriguez.

The previous day, law enforcement officials observed the dark blue boat being hauled by a pickup truck along Interstate Route 75 to a Mobil service station in Naples, Florida. At the Mobil station, Lewis told an undercover agent that the boat had been sold and brought from Fort Lauderdale for delivery. On the evening before the rendezvous with the Turtola, Slappey, Frese, and Lewis checked into the Knights Inn in Naples. The next morning, they were observed refueling the dark blue go-fast boat, which was then tracked on a course that took it 100 miles into the Gulf of Mexico to the Turtola.

After the coast guard interrupted the offloading and the dark blue fast boat fled the scene without lights, a coast guard pilot in a helicopter who pursued the boat in the darkness turned a spotlight on the boat and saw a light colored cargo that resembled marijuana bales. On a second spotlighted passage over the boat, no cargo was visible. After a coast guard vessel pursued the dark blue boat and unsuccessfully tried to get it to stop, the coast guard boarded the vessel, which was travelling at a speed of fifteen knots. The boat carried communications equipment that connected with another go-fast boat and the Turtola, and a book of matches from the Knights Inn. A small quantity of marijuana was found on board. Paint on the blue boat's hull matched the Turtola's paint.

On the day before the rendezvous, another customs agent observed the white go-fast boat in Naples, Florida. The agent testified that it was unusual to see such a vessel around Naples on a Tuesday evening. The agent observed Cruz and Lugo at close range and identified them at trial. He saw them launching the boat. The next day the agent surveilled the white boat from the air to a point approximately 80 miles off shore, heading for the Turtola.

After the white boat left the rendezvous, it headed toward the Florida coast without lights. At some point, the boat's motor apparently failed, the boat stopped moving, and the coast guard seized it. On boarding the boat, coast guard personnel immediately smelled bleach. In addition, the LORAN coordinates of the vessel (used for navigation) were nonsensical, suggesting tampering. "For sale" signs had been removed. The boat was the one the agent originally had seen in Naples.

The morning after their apprehension on the dark blue fast boat, Slappey, Frese, and Lewis were transported to shore aboard a Coast Guard vessel. The three men were taken on deck, where a Coast Guardsman pointed out the Turtola, which also was being taken in by the Coast Guard. When Slappey saw the Turtola, he said "Oh, shit." Defendant Frese, upon seeing the Turtola, lowered his head.

On the morning after the seizure, a bale of marijuana packaged the same way as those seized on the Turtola washed ashore on the west coast of Florida.

## II

The appellants challenge their convictions on numerous grounds, and one of them challenges his sentence as violating the Sentencing Guidelines. We have reviewed these contentions, but find them unpersuasive. Only two of the issues raised require discussion: whether the district court properly admitted certain documents relating to a Panamanian bank, and whether the evidence supports the convictions.

## III

A. Among the items seized on the Turtola were three slips showing substantial deposits in a single account in a Panamanian bank, and an application form to obtain checks from that bank. Two of the deposit slips were signed by appellant Munoz. The third deposit was signed by Gonzales, the captain of the Turtola and had Munoz's name inscribed on it. The dates on these deposit slips preceded the beginning of the Turtola's voyage.

These four documents were found in a pouch or bag behind the mattress in a single berth in a cabin. In addition to the four bank documents, the pouch contained identification papers, including Munoz's passport and his seaman's identification document, and numerous other papers.

After two evidentiary hearings during the trial, the district court, over appellant Munoz's objection, admitted the four documents as part of the government's case. The court held that all the documents were admissible under Fed.R.Evid. 804(b)(5), the catch-all exception to the hearsay rule, which provides that a statement is not excluded by that rule if the declarant is unavailable and the statement meets certain criteria. The court found the documents reliable and authentic because Munoz had preserved them in his possession and had relied upon them as evidence of important commercial transactions, because the signatures on two of the deposit slips matched the signatures on Munoz's identification papers, and because they bore markings typical of bank documents. The court further held that the two deposit slips containing Munoz's signature also were admissible as admissions under Fed.R.Evid. 801(d)(2)(A), which provides that a statement is not hearsay if it is the statement of the party against whom it is offered.

B. Munoz contends that the district court improperly admitted the bank deposit slips and check application form because the documents did not meet the standards of the hearsay exceptions in Fed.R.Evid. 804(b)(5) and 801(d)(2)(A).

■ 1. Preliminarily, Munoz argues that the documents were not properly authenticated under Fed.R.Evid. 901(a), which is required "as a condition precedent to admissibility." Under the Rule, the authentication requirement is satisfied "by evidence sufficient to support a finding that the matter in question is what its proponent claims." Fed. R.Evid. 901(a); *see also Bury v. Marietta Dodge*, 692 F.2d 1335, 1338 (11th Cir.1982). A district court has discretion to determine authenticity, and that determination should "not be disturbed on appeal absent a showing that there is no competent evidence in the

record to support it." *United States v. Caldwell,* 776 F.2d 989, 1001 (11th Cir.1985).

■ Here, the proffered evidence were bank deposit slips and a check application form, all bearing the same account number of a listed bank. Munoz' signature on two of the deposit slips matched his signature on his identification papers. The bank documents had been kept with Munoz' other possessions in a bag found in a bunk aboard the Turtola. As the district court noted, the markings on the documents were typical of bank documents.

Authentication may be established by "[a]ppearance, contents, substance, internal patterns, or other distinctive characteristics, taken in conjunction with circumstances." Fed.R.Evid. 901(b)(4). The district court's finding of authentication was supported by its findings that the four documents bore markings typical of bank documents, that Munoz's signature on two deposit slips was similar to his signature on his identification documents, and that he retained those records in his possession, thereby indicating his own belief of their importance. His keeping these documents is a strong indication of their authenticity. *See Burgess v. Premier Corp.,* 727 F.2d 826, 835 (9th Cir.1984) (district court properly could have found documents authentic because they were discovered in defendant's warehouse, when no motive was shown for storing false documents). The district court did not abuse its discretion in ruling that the documents were adequately authenticated.

2. Rule 804(b)(5) provides that if "the declarant is unavailable as a witness," a statement "having equivalent [to other specified hearsay exceptions] circumstantial guarantees of trustworthiness" is not excluded by the hearsay rule

> if the court determines that (A) the statement is offered as evidence of a material fact; (B) the statement is more probative on the point for which it is offered than any other evidence which the proponent can procure through reasonable efforts; and (C) the general purposes of these rules and the interests of justice will best be served by admission of the statement into evidence. However, a statement may not

be admitted under this exception unless the proponent of it makes known to the adverse party sufficiently in advance of the trial or hearing to provide the adverse party with a fair opportunity to prepare to meet it, the proponent's intention to offer the statement and the particulars of it, including the name and address of the declarant.

a. First, Munoz contends that the government did not show, as the rule requires, that "the declarant is unavailable as a witness." He argues that the government should have called, or attempted to compel the testimony of, the official of the Panamanian bank who had custody of the deposit slips and check application forms, to testify about their accuracy and reliability. The district court ruled that because of the Panamanian bank secrecy law, the custodian would not have been available as a witness.

■ The "declarant" for the two deposit slips that Munoz signed and for the check application form showing the same account number, however, was not the Panamanian bank custodian of such records, but Munoz himself, since the documents reflected his declaration that he had made the deposits and indicated his intention to maintain the bank account. Munoz also was a declarant on the deposit slip signed by Gonzales, since the listing of his name and the account number on the slip was a statement by him that the third deposit was made to his account. Munoz was an unavailable declarant because the government could not have compelled him, as a defendant, to testify.

Since Munoz was the declarant in these documents, their introduction into evidence did not violate his rights under the confrontation clause of the Constitution.

■ b. Munoz next questions whether these documents have "equivalent circumstantial guarantees of trustworthiness." Fed.R.Evid. 804(b)(5). The district court justifiably concluded that the documents had sufficient indicia of trustworthiness and reliability to permit their introduction into evidence. The court noted that the documents all bore typical bank markings and therefore

were reliable evidence of banking transactions. With respect to the general reliability of the documents, the court noted they were "kept in a circumstance where one person who has access to this account would have kept documents that he believed in, relied on, and thought were important."

c. The next issue is whether the documents met the standards in subsections (A), (B), and (C) of the rule.

Subsection (A) requires that the "statement be offered as evidence of a material fact." Munoz apparently does not question the materiality of the documents. The two bank deposit slips Munoz signed showed that he had made substantial deposits shortly before the voyage of the Turtola and the third slip showed that the captain of the vessel had also made a large deposit to the same account. The check order form confirmed that the account was that of Munoz and suggested that he intended to continue using the account.

 The jury could have inferred from this evidence that significant payments had been made to Munoz prior to the voyage, presumably as advance monies to finance the venture. The deposit slip the captain signed, which had Munoz's name on it, showed that the two men had a prior association involving the deposit of a substantial amount.

 Subsection (B) requires that the statement be more probative on the point for which it is offered than any other evidence which the proponent can procure through reasonable efforts. The district court correctly determined that the deposit slips were more probative of the making of the deposits than other available evidence the government might reasonably have obtained.

 Subsection (C) requires that the general purposes of the rules of evidence and the interests of justice would be best served by the admission of the statements. This requirement is essentially a restatement of Rule 102. *Robinson v. Shapiro,* 646 F.2d 734, 743 (2d Cir.1981). The district court's admission of this evidence was consistent with the general requirement in that rule to provide a speedy, inexpensive and fair trial designed to reach the truth.

d. Finally, Munoz contends that the government did not comply with the notification requirements of the last sentence of the rule. At trial counsel for Munoz stated that he had known of the documents one month before the trial, and also knew at that time that the government intended to introduce them. On admitting the documents, the court stated that their existence "has been known to counsel for all defendants for a long time" and that although they may not have known the precise hearing exception under which the government would offer the documents, "they certainly knew that they might have to deal with [them] under some exemption or other ... and that has given them some opportunity to look at [the documents]".

 There is no particular form of notice required under the rule. As long as the party against whom the document is offered has notice of its existence and the proponent's intention to introduce it—and thus has an opportunity to counter it and protect himself against surprise—the rule's notice requirement is satisfied. *United States v. Evans,* 572 F.2d 455, 489 (5th Cir.), *cert. denied,* 439 U.S. 870, 99 S.Ct. 200, 58 L.Ed.2d 182 (1978) (discussing the equivalent notice requirement under Rule 803(24)). That standard was satisfied here.

The district court has considerable discretion in determining admissibility under Rule 804(b)(5). *Perryman v. Johnson Products Co., Inc.,* 698 F.2d 1138, 1147 (11th Cir.1983). It did not abuse that discretion here.

In view of our holding that the documents were admissible under Rule 804(b)(5), we need not reach the district court's ruling that the two deposit slips Munoz signed also were admissible under Rule 801(d)(2)(A).

## IV

The other appellants (but not Munoz) challenge the sufficiency of the evidence to support their convictions.

 In deciding that question, we view the evidence and the inferences that may be drawn therefrom in the light most favorable to the government. *See Glasser v. United*

*States*, 315 U.S. 60, 80, 62 S.Ct. 457, 469, 86 L.Ed. 680 (1942); *United States v. Blanco*, 920 F.2d 844, 845 (11th Cir.1991). Evidence is sufficient to support a conviction if a reasonable trier of fact could find that the evidence establishes guilt beyond a reasonable doubt. *United States v. Bell*, 678 F.2d 547, 549 (5th Cir.1982) (en banc), *aff'd*, 462 U.S. 356, 103 S.Ct. 2398, 76 L.Ed.2d 638 (1983); *United States v. Vidal–Hungria*, 794 F.2d 1503, 1513 (11th Cir.1986). All reasonable inferences from the evidence must be drawn in favor of the jury's verdict. *United States v. Johnson*, 713 F.2d 654, 661 (11th Cir.1983), *cert. denied*, 465 U.S. 1030, 104 S.Ct. 1295, 79 L.Ed.2d 695 (1984). Participation in a conspiracy may be inferred from circumstantial evidence. *United States v. Delgado*, 903 F.2d 1495, 1500 (11th Cir.1990), *cert. denied*, 498 U.S. 1028, 111 S.Ct. 681, 112 L.Ed.2d 673 (1991). We conclude that under these standards the evidence is sufficient to sustain the convictions.

One fact that stands out in this case, and distinguishes it from other boat cases on which the appellants rely, is that advance arrangements obviously were made for the Turtola and the fast boats to meet a hundred miles off the Florida coast at night to offload the large amount of marijuana the Turtola was carrying. This meeting did not occur without careful and detailed planning. The circumstances justify the jury's conclusion that the crewmembers aboard the Turtola and the fast boats knew both their intended destination (the remote pinpointed rendezvous spot in the Gulf of Mexico) and the purpose of the trip (offloading the marijuana from the Turtola to the fast boats and smuggling it in to the United States).

A. Three of the appellants, who were crew members of the Turtola (Vizcaino, Casanga, and Rengifo–Bacelli), contend that the district court applied an incorrect standard of sufficiency of the evidence in denying their motions for acquittal, and that under the proper standard, their convictions must fall. They argue that the correct standard is that applied in *United States v. Vidal–Hungria*, 794 F.2d 1503 (11th Cir.1986), and not the allegedly less stringent standard of *United States v. Cruz–Valdez*, 773 F.2d 1541 (11th Cir.1985) (en banc), *cert. denied*, *Ariza–Fuentas v. U.S.*, 475 U.S. 1049, 106 S.Ct. 1272, 89 L.Ed.2d 580 (1986), which they assert the district court applied.

*Cruz–Valdez* was an *en banc* decision in which the court sought "to clarify the standards determining sufficiency of the evidence in cases where the primary evidence supporting a defendant's conviction is his presence aboard a vessel containing large quantities of marijuana." *Id.* at 1543. The *en banc* decision involved a crewman aboard a 68–foot shrimp trawler the Coast Guard stopped and boarded ten miles northwest of Key West, Florida. *Id.* The vessel's fishing gear was inoperative, it was not engaged in shrimping, and it had no ice, fish or shrimp in the hold. *Id.* at 1544. The vessel contained 220 bales of marijuana, one of which weighed 43 lbs., which were in the hold under an unlocked hatch. *Id.*

We rejected the crewman's contention that his conviction on drug charges was improper because it rested on his mere presence aboard a vessel where illegal drugs were discovered. We noted that "our cases have given one factor—the quantity of marijuana on board a vessel—particular attention." *Id.* at 1546. We pointed out that

once it is established that the defendant was a crew member on a vessel so laden the government's burden to prove participation is relatively light. Furthermore, that burden may be met by any one of a number of factors. While [*U.S. v.*] *Alfrey* [620 F.2d 551 (5th Cir.1980) ] and [*U.S. v.*] *DeWeese* [632 F.2d 1267 (5th Cir.1980) ] point to a long voyage with the inference of a close relationship between captain and crew, we may also look to other circumstances such as suspicious behavior or diversionary maneuvers before apprehension, an attempt to flee, inculpatory statements made after apprehension, witnessed participation as a crewman, whether the contraband was obvious, and the absence of supplies or equipment necessary to the vessel's intended use. The government's relatively light burden of proving knowing and voluntary participation by a person aboard a marijuana laden vessel may be met by any evidence sufficient to enable a

reasonable jury to find his guilt beyond a reasonable doubt.

*Id.* at 1547.

In *Vidal–Hungria,* the Coast Guard stopped a 156 foot coastal freighter seven miles off the coast of the Bahamas. 794 F.2d at 1505. The vessel contained a large cargo of cement and lumber properly stored in the hold. *Id.* at 1506. The Coast Guard was unable in its initial search of the vessel to uncover drugs. *Id.* Only more than two hours after boarding did the Coast Guard discover marijuana. *Id.* The "marijuana on board was secreted in tightly sealed compartments which emitted at most a negligible odor not detected by several Coast Guard officers trained in searching for contraband, and detected by one officer only after standing near the sealed vent leading to the compartment for more than an hour." *Id.* at 1514.

This court reversed the convictions of seven crew members for conspiring to possess and possessing marijuana, on the ground that the circumstances of the discovery of the marijuana "does not lend itself to an inference that all persons on the vessel necessarily knew of the presence of the marijuana." *Id.* The court ruled that the presence of the large quantity of concealed drugs aboard the vessel "simply is not a controlling factor in the instant case in light of the totality of the circumstances presented." *Id.* at 1513. The court stated that unlike *Cruz–Valdez,* where it held that "in cases where the evidence indicates that the large quantity of marijuana on a vessel *is* highly significant, the government's burden to prove participation in a conspiracy to possess and possession is relatively light after the existence of the large quantity has been established," here "where the large quantity of marijuana is of less significance, the government's remaining burden is heavier and we require a greater amount of additional evidence." *Id.* at 1515. It stated "[a]fter considering the totality of the circumstances in this case, we conclude that if a jury had given the crew members' cases individualized consideration on the evidence presented at trial, and had applied the correct legal standards, it necessarily would have entertained a reasonable doubt as to

their guilt. We must, therefore, reverse their convictions." *Id.* at 1516.

■ In the present case, "the totality of the circumstances" shows that, unlike *Vidal–Hungria,* the convictions of the three crew members of the Turtola rested on far more than the presence of a large amount of marijuana on the vessel. Several of the factors that the court cited in *Cruz–Valdez,* as among the "other circumstances" that would suffice "to enable a reasonable jury to find [the defendant's] guilt beyond a reasonable doubt," 773 F.2d at 1547, also are present here.

The Turtola apparently carried no other cargo than the marijuana. One of the crew members, Rengifo–Bacelli, made the inculpatory statement after his arrest on the vessel that he had participated in offloading the marijuana. When the Coast Guard vessel approached the Turtola in the process of offloading the drugs, the Turtola attempted to flee, tried to ram the Coast Guard vessel that was pursuing it, and finally stopped only after the Coast Guard had fired shots across its bow.

There was additional evidence that supported the jury verdict. Offloading the large amount of marijuana on board would have required the help of the crew—one man could not have done it alone. Although the marijuana was concealed below deck in a false compartment, the hole through which the marijuana was to be removed was made in the floor of the mess hall, where the crewmen normally would congregate and would observe what was going on. The ship's ledger showed substantial payments to crewmembers. The court's observation in *Cruz–Valdez* that "it is highly improbable that drug smugglers would allow an outsider on board a vessel filled with millions of dollars worth of contraband" (773 F.2d at 1546), is equally applicable here. As in that case, "[t]he totality of the evidence was clearly sufficient", *id.* at 1547, to sustain the convictions of the crewmembers of the Turtola.

■ B. The challenge to the sufficiency of the evidence by the other appellants—who were crewmen aboard the dark blue and white fast boats—need not detain us long.

1. Lewis and Slappey were crewmembers of the dark blue fast boat. (The third crewman, Frese, did not appeal.) The day before the rendezvous, Lewis told an undercover agent in West Florida that they were delivering the dark blue boat to its new owner. The three crewmembers had travelled together from the east to the west coast of Florida and stayed overnight at the same motel before heading in the boat to the Turtola.

After the dark blue boat fled without lights from the Turtola when the Coast Guard vessel approached it, a helicopter searchlight showed what appeared to be bales of marijuana on the deck of the boat. When the searchlight beam later again passed over the boat, the bales were gone. After the boat was stopped and boarded, a small amount of marijuana was found aboard. The boat had communications equipment that connected with the Turtola and another fast boat. Paint on the boat's hull matched the Turtola's paint.

The totality of the circumstances justified the jury's conclusion that Slappey and Lewis were knowing participants in the illegal drug importation scheme.

Finally, when Slappey, Lewis and Frese were shown the Turtola being taken in by the Coast Guard, Slappey's statement, "Oh, shit," and Frese's lowering of his head were further indication of their awareness of and participation in the scheme and their realization that the venture had failed.

2. Cruz and Rodriguez were aboard the white fast boat. (The third crewmember of that boat, Lugo, also did not appeal.)

As in the case of the dark blue boat, both the timing of the white boat's trip (at night going a hundred miles out to sea) and the direction taken (to an obviously prearranged rendezvous spot with the Turtola) indicated that the crewmembers had made careful advance arrangements and were fully aware of the purpose and objective of their trip. The boat fled without lights after the Coast Guard interrupted the offloading operation, and its trip returning from the rendezvous point to the mainland continued until its motor failed twelve miles from the coast. Its trips were tracked on radar. The evidence justified the jury in concluding that the presence of the white boat at the site of the offloading was the result of the knowing participation by the boat's crew in the drug smuggling operation and not coincidental. *United States v. Gutierrez,* 931 F.2d 1482, 1489 (11th Cir.1991), *cert. denied, Roque v. U.S.,* —— U.S. ——, 112 S.Ct. 905, 116 L.Ed.2d 806 (1992).

The evidence in this case is much stronger than the evidence in the "mere presence" cases Cruz and Rodriguez cite. For example, in *United States v. Pintado,* 715 F.2d 1501 (11th Cir.1983), the defendants were in a house where an off-load of marijuana took place, not at an isolated spot in the Gulf of Mexico in the dubious circumstances previously described. In *United States v. Villegas,* 911 F.2d 623 (11th Cir.1990), *cert. denied,* 499 U.S. 977, 111 S.Ct. 1625, 113 L.Ed.2d 722 (1991), the evidence was insufficient to show that the defendant did not simply follow his brother, who had car trouble, to a nearby mall, where the drug transaction occurred. In *United States v. Mieres–Borges,* 919 F.2d 652 (11th Cir.1990), *cert. denied,* 499 U.S. 980, 111 S.Ct. 1633, 113 L.Ed.2d 728 (1991), the defendants' fishing boat did not match the description of the boat observed at the off-load site twelve hours after the off-load, and had no contraband on board.

Here, the totality of the evidence showed more than mere presence and flight. It was sufficient to support the convictions of Cruz and Rodriguez.

### CONCLUSION

The convictions of all the appellants, and the sentence of Munoz, are AFFIRMED.