UNITED STATES of America, Plaintiff-Appellee,

v.

Mohamed SIDDIQUI, Defendant-Appellant.

No. 98-6994.

United States Court of Appeals,

Eleventh Circuit.

Dec. 15, 2000.

Appeal from the United States District Court for the Southern District of Alabama, No. 97-00085-CR-1),
Richard W. Vollmer, Judge.

Before COX and HULL, Circuit Judges, and GEORGE[*], District Judge.

GEORGE, District Judge:

Mohamed Siddiqui appeals his convictions for fraud and false statements to a federal agency, and

obstruction in connection with a federal investigation. Siddiqui challenges the district court's admission into

evidence of e-mail and foreign depositions.

I.  *Background*

The National Science Foundation ("NSF") is a congressionally established federal agency. The NSF

presents the Waterman Award annually to an outstanding scientist or engineer, and consists of a $500,000

research grant. To become eligible for the Waterman Award, candidates are nominated by a nominator who

completes and submits a form to the NSF, and recruits four outside references to support the candidate. The

nominator identifies the references on the form, and sends forms to the references for letters to be submitted

on behalf of the nominee.

On December 15, 1996, Susan Fannoney, Executive Secretary of the Waterman Award, received a

form indicating that Dr. Hamuri Yamada was nominating Mohamed Siddiqui, an Indian citizen, and at that

time a visiting professor at the University of South Alabama, for the award. The nomination form listed three

references, Dr. von Gunten, James Westrick and Dr. Mysore. Along with the nomination form, Ms. Fannoney

received a reference form apparently signed by von Gunten, recommending Siddiqui for the Waterman

Award. In addition, Fannoney received by fax a letter of reference from James Westrick.

On January 14, 1997, Fannoney received a letter from von Gunten addressed to the Waterman

---

[*]Honorable Lloyd D. George, District Judge for the District of Nevada, sitting by designation.

Awards Committee. The letter stated that von Gunten had received confirmation for a letter of recommendation in support of Siddiqui, but that he had never sent such a letter. Fannoney alerted the Inspector General's office, which began an investigation. On February 7, 1997, Fannoney received a fax from Siddiqui stating that he was withdrawing his name from consideration for the award.

On February 18, 1997, Jodi Saltzman, a special agent with the NSF interviewed Siddiqui at Siddiqui's office at the University of South Alabama. During the interview, Siddiqui signed a statement admitting that he had nominated himself for the Waterman Award, but that he had permission from Yamada and von Gunten to submit forms on their behalf. Siddiqui also acknowledged in the statement that Westrick had recommended Siddiqui for a different award, the PECASE Award, but that Siddiqui had changed the wording of the letter to apply to the Waterman Award. Siddiqui was indicted on April 29, 1997.

Before trial, the government moved the court to allow the taking of the depositions of Yamada, who resided in Japan, and von Gunten, who resided in Switzerland. In support of the motion, the government provided Agent Saltzman's affidavit indicating that von Gunten had stated outright that he would not come to the United States to testify, and that Yamada would not be able to testify in the United States because of conflicts with personal commitments.

Siddiqui opposed the taking of the depositions on the grounds that the witnesses' personal presence at trial was necessary, and that Indian travel restrictions for its citizens residing abroad prevented him from traveling to Japan and Switzerland. Specifically, Siddiqui asserted that because of religious persecution in India his travel to Japan or Switzerland related to the criminal action would put his family members still living in India at risk. The magistrate judge ruled that the government had carried its burden of showing that Yamada and von Gunten would be unavailable to appear at trial, and instructed that Siddiqui's fear of obtaining a travel visa from India because of the threat of persecution of family members should not preclude the taking of the foreign depositions.

Yamada's deposition was taken in Japan on March 6, 1998. At government expense, Siddiqui's counsel attended the deposition and cross-examined the witness, but was not in telephonic contact with Siddiqui during the deposition. Yamada testified that on February 1, 1997, she received an e-mail stating that if she received a phone call from the NSF to "please tell good words about me." Yamada testified that she knew the e-mail was from Siddiqui because the name on the e-mail had Siddiqui's sender address, and it ended with the name "Mo" which Siddiqui had previously told her was his nickname, and which he had used in previous e-mail.

Yamada further testified that she never signed or submitted a Waterman Award form on behalf of Siddiqui, nor had she given Siddiqui permission to sign her name to the form. On February 22, 1997, Yamada received another e-mail from Siddiqui requesting that she prepare a letter indicating that she had permitted Siddiqui to sign the nomination form on her behalf. Yamada testified that during that time period Siddiqui had also contacted her by phone making the same request, and that she recognized his voice. On February 28, 1997, Yamada sent an e-mail to Agent Saltzman stating that she had permitted Siddiqui to sign on her behalf. Yamada later admitted to Saltzman that she had not given Siddiqui permission to sign, but had made the earlier representation because she thought Siddiqui would go to jail.

During cross-examination of Yamada at the deposition, Siddiqui's counsel introduced an e-mail from Yamada to Siddiqui. This e-mail contained the same e-mail address for Siddiqui as the e-mail received by Yamada and von Gunten apparently from Siddiqui.

Von Gunten's video deposition was taken in Switzerland. At government expense, Siddiqui's counsel attended the deposition and cross-examined von Gunten. During the deposition, Siddiqui was in communication with his counsel by telephone. Von Gunten testified at the deposition that he had not submitted a letter of recommendation in favor of Siddiqui for the Waterman Award, and that he had not given Siddiqui permission to submit such a letter in his name.

Von Gunten further testified that on February 24, 1997, he received an e-mail from what appeared to be Siddiqui's e-mail address asking him to tell the NSF that Siddiqui had permission to use von Gunten's name. Von Gunten replied by e-mail to the address that he could not tell the NSF anything but the truth. Von Gunten also testified that during the same time period as the exchange of e-mail he spoke with Siddiqui by phone two or three times. In those conversations, in which Siddiqui identified himself and von Gunten recognized his voice, Siddiqui urged von Gunten to change the statements that he had made to the NSF that Siddiqui did not have permission to use von Gunten's name. Von Gunten refused those requests.

During trial, the district court allowed the depositions to be read into evidence, and admitted the e-mail into evidence.

II.    *Discussion*

Siddiqui assigns four errors to the proceedings below. He claims that the district court abused its discretion by allowing the government to offer the e-mail into evidence without proper authentication, and over Siddiqui's hearsay objections. Siddiqui further claims that the district court erred by admitting Yamada's and von Gunten's depositions because Siddiqui was not present at the depositions, and because the court did

not insure that Siddiqui be allowed to enter Japan and Switzerland to attend the depositions. Finally, Siddiqui claims that the district court erred by admitting Yamada's and von Gunten's depositions without a showing that the deponents were unavailable for trial.

We review the district court's authentication rulings for abuse of discretion. *United States v. Mendez,* 117 F.3d 480, 484 (11th Cir.1997). In the absence of a contemporaneous objection, hearsay claims are reviewed under the plain error doctrine. *United States v. Hernandez,* 896 F.2d 513, 523 (11th Cir.), *cert. denied,* 498 U.S. 858, 111 S.Ct. 159, 112 L.Ed.2d 125 (1990). We review the district court's authorization of foreign depositions for abuse of discretion, *United States v. Drogoul,* 1 F.3d 1546, 1552 (11th Cir.1993), and give plenary review to claims of constitutional error for a failure to show the unavailability of an out-of-court declarant. *United States v. McKeeve,* 131 F.3d 1, 7 (1st Cir.1997).

A.      *Authentication of the E-mail*

Under Fed.R.Evid. 901(a), documents must be properly authenticated as a condition precedent to their admissibility "by evidence sufficient to support a finding that the matter in question is what its proponent claims." A document may be authenticated by "[a]ppearance, contents, substance, internal patterns, or other distinctive characteristics, taken in conjunction with circumstances." Fed.R.Evid. 901(b)(4); *United States v. Smith,* 918 F.2d 1501, 1510 (11th Cir.1990) ("[t]he government may authenticate a document solely through the use of circumstantial evidence, including the document's own distinctive characteristics and the circumstances surrounding its discovery"), *cert. denied sub nom., Hicks v. United States,* 502 U.S. 849, 112 S.Ct. 151, 116 L.Ed.2d 117 (1991), *and cert. denied sub nom., Sawyer v. United States,* 502 U.S. 890, 112 S.Ct. 253, 116 L.Ed.2d 207 (1991). A district court has discretion to determine authenticity, and that determination should not be disturbed on appeal absent a showing that there is no competent evidence in the record to support it. *United States v. Munoz,* 16 F.3d 1116, 1120-21 (11th Cir.), *cert. denied sub nom., Rodriguez v. United States,* 513 U.S. 852, 115 S.Ct. 153, 130 L.Ed.2d 92 (1994).

In this case, a number of factors support the authenticity of the e-mail. The e-mail sent to Yamada and von Gunten each bore Siddiqui's e-mail address *"msiddiquo @jajuar1.usouthal.edu"* at the University of South Alabama. This address was the same as the e-mail sent to Siddiqui from Yamada as introduced by Siddiqui's counsel in his deposition cross-examination of Yamada. Von Gunten testified that when he replied to the e-mail apparently sent by Siddiqui, the "reply-function" on von Gunten's e-mail system automatically dialed Siddiqui's e-mail address as the sender.

The context of the e-mail sent to Yamada and von Gunten shows the author of the e-mail to have been someone who would have known the very details of Siddiqui's conduct with respect to the Waterman Award and the NSF's subsequent investigation. In addition, in one e-mail sent to von Gunten, the author makes apologies for cutting short his visit to EAWAG, the Swiss Federal Institute for Environmental Science and Technology. In his deposition, von Gunten testified that in 1994 Siddiqui had gone to Switzerland to begin a collaboration with EAWAG for three or four months, but had left after only three weeks to take a teaching job.

Moreover, the e-mail sent to Yamada and von Gunten referred to the author as "Mo." Both Yamada and von Gunten recognized this as Siddiqui's nickname. Finally, both Yamada and von Gunten testified that they spoke by phone with Siddiqui soon after the receipt of the e-mail, and that Siddiqui made the same requests that had been made in the e-mail. Considering these circumstances, the district court did not abuse its discretion in ruling that the documents were adequately authenticated.

B.      *Hearsay Challenge to Admission of the E-mail*

Siddiqui argues that the e-mail addressed to Yamada and von Gunten was erroneously allowed into evidence over hearsay objections. The government responds that Siddiqui posed no hearsay objections to the e-mail, and the issue therefore should be reviewed for plain error. In the portions of the record identified by Siddiqui as hearsay objections to the e-mail (R4-39, 174, R5-266), Siddiqui's counsel objects based on the government's failure to show with reliability who sent the e-mail. Because these objections go to authentication, and are not hearsay objections, Siddiqui's assignment of error lacks merit.

Even if Siddiqui had preserved hearsay objections to the introduction of the e-mail, however, the district court would have been within its discretion in denying the objections. The e-mail was properly authenticated. Those sent by Siddiqui constitute admissions of a party pursuant to Fed.R.Evid. 801(d)(2)(A), and those between Siddiqui and Yamada unrelated to the NSF investigation are non-hearsay admitted to show Siddiqui's and Yamada's relationship and custom of communicating by e-mail.

C.      *Admission of Foreign Depositions*

Siddiqui argues that the admission of Yamada's and von Gunten's depositions taken outside of Siddiqui's presence violated the confrontation clause of the Sixth Amendment. Specifically, Siddiqui contends that the government failed to make a diligent effort to ensure Siddiqui's attendance at the depositions, and did not provide Siddiqui with the opportunity to confer with his attorney during the Yamada deposition.

Depositions, particularly those taken in foreign countries, are generally disfavored in criminal cases. *United States v. Mueller,* 74 F.3d 1152, 1156 (11th Cir.1996). Nevertheless, depositions are authorized "when doing so is necessary to achieve justice and may be done consistent with the defendant's constitutional rights." *Id. See* Fed.R.Crim.P. 15.

In this case, the magistrate judge ruled that Siddiqui had the choice of attending the depositions at the risk of possibly placing his family in jeopardy in India, or waiving his confrontation right and allowing the depositions to be attended by his attorney. Siddiqui made no request of the magistrate judge or the government to assist him in removing barriers so that he could attend the depositions, which suggests that Siddiqui made a calculated decision not to alert Indian authorities by seeking to lift travel restrictions. Indeed, in the face of the possible threat to Siddiqui's family, it would have been improvident for the government to proceed on international fronts absent Siddiqui's express consent. After failing to authorize the government to proceed on his behalf, Siddiqui cannot now claim that his confrontation rights were violated by the government's failure to act unilaterally.

Siddiqui's counsel attended Yamada's and von Gunten's depositions at government expense. In each deposition, oaths were administered to the witnesses, counsel had an unlimited opportunity for direct and cross examination, objections were made and preserved for trial, a judicial officer presided, and transcripts were provided. Siddiqui was in contact by telephone with counsel during the von Gunten deposition. Except for the lack of telephone contact with counsel during the Yamada deposition, Siddiqui does not challenge any other aspect of the manner of the taking of the depositions, nor does he suggest that the law of the host countries was violated in any respect.

The Eleventh Circuit has recognized the approval of foreign depositions even "where the proceeding was in a foreign language and conducted by a judicial officer rather than counsel." *Mueller,* at 1157 (citing *United States v. Salim,* 855 F.2d 944, 954-55 (2d Cir.1988)). In the absence of any indication that the manner of the Yamada examination was so incompatible with principles of fairness or prone to inaccuracies or bias as to render the testimony inherently unreliable, *see Salim,* 855 F.2d at 953, and in view of Siddiqui's decision not to pursue attending the deposition, the lack of telephone contact between Siddiqui and his lawyer during the deposition does not amount to a violation of the confrontation clause.

D. *Unavailability of Yamada and von Gunten*

Siddiqui argues that his Sixth Amendment confrontation rights were violated when the district court

found that Yamada and von Gunten were unavailable to testify at trial before admitting their depositions. The standard for unavailability is whether the witness' attendance could be procured "by process or other reasonable means." Fed.R.Evid. 804(a)(5). In criminal cases, the Sixth Amendment requires the government to show (1) that the out-of-court declarant is unavailable to testify despite its good faith efforts to obtain his presence at trial, and (2) that the out-of-court statements bear sufficient indicia of reliability to provide the jury with an adequate basis for evaluating their truth. *United States v. Chapman,* 866 F.2d 1326, 1330 (11th Cir.), *cert. denied,* 493 U.S. 932, 110 S.Ct. 321, 107 L.Ed.2d 312 (1989). The lengths to which the government must go to produce a witness is a matter of reasonableness. *Ohio v. Roberts,* 448 U.S. 56, 74, 100 S.Ct. 2531, 65 L.Ed.2d 597 (1980).

During his deposition, von Gunten unequivocally stated that it would be impossible for him to travel to the United States for the trial. On May 11, 1998, the government faxed a letter to von Gunten explaining that the case against Siddiqui would be much stronger if he could attend the trial, and that it would pay von Gunten's expenses to attend the trial. On May 13, 1998, von Gunten sent a fax to the government confirming that he would not be able to testify at the trial. The government, therefore, has shown that von Gunten was unavailable to testify despite the government's good faith efforts to obtain his presence at trial.

As to Yamada, the government points out that the district court had before it the affidavit of the NSF agent Saltzman, who stated her belief that, based on both Yamada's numerous reasons given for not traveling to the United States to testify, she would not testify at trial regardless of when it was scheduled. The government also submits that when pressed for a definite answer to whether she would attend the trial, Yamada stated, "I don't want to go, if possible." On May 11, 1998, the government faxed to Yamada the same message that it sent to von Gunten, urging Yamada's attendance at trial beginning on May 14, 1998. On May 15, 1998, the government received an overnight mail response from the center where Yamada worked indicating that Yamada would be away from her office and unavailable to testify.

Siddiqui responds that Yamada's testimony was at least equivocal, and that Yamada several times expressed a willingness to attend trial. For instance, moments before Yamada stated that she did not want to attend trial, she also conveyed that she was annoyed by the case, and that she would attend, if necessary, in order to have it finished. Siddiqui further argues that the overnight mail response from the center regarding Yamada's unavailability was dated May 18, 1998, and that her testimony was needed on May 15, 1998.

We find that the government made an adequate showing of Yamada's unavailability. Yamada was

initially indefinite during her deposition about whether her schedule would permit her to attend trial and whether the university would give her permission, but her last word on the matter was "I don't want to go, if possible." This was in direct response to the government's request that Yamada state whether she would attend trial or not. Moreover, Yamada did not indicate a change of mind even after the government sent the May 11, 1998, fax urging Yamada's trial attendance. Under such circumstances, the government would not reasonably be expected to have done more.

We also conclude that the out-of-court statements bear sufficient indicia of reliability to provide the jury with an adequate basis for evaluating their truth. As previously stated, Yamada and von Gunten were administered oaths in their depositions, counsel had an unlimited opportunity for direct and cross examination, objections were made and preserved for trial, a judicial officer presided, and transcripts were provided.

AFFIRMED.