WILSON, Circuit Judge,
dissenting:
I dissent because I am convinced that the evidence was sufficient to support Ar-bane’s conviction for conspiracy to import cocaine into the United States. The opinion concludes that the evidence was insufficient to convict Arbane because the government failed to prove that Arbane conspired with anyone other than the government informant Velez. I disagree. I think that there was sufficient evidence from which a reasonable jury could find that Arbane conspired with Jose Lopez- *1234 Posada, the man who guarded the drugs, to import cocaine into the United States during the indictment period.
“To prove participation in a conspiracy, the government must have proven beyond a reasonable doubt, even if only by circumstantial evidence, that a conspiracy existed and that the defendant knowingly and voluntarily joined the conspiracy.” United States v. Garcia, 405 F.3d 1260, 1269 (11th Cir.2005) (per curiam). To meet this burden, “the government need not prove that the defendant! ] knew all of the detail[s] or participated in every aspect of the conspiracy. Rather, the government must only prove that the defendant!] knew the essential nature of the conspiracy.” Id. at 1269-70 (citation and quotations omitted). The government may prove the existence of a conspiracy by “direct or circumstantial evidence, including inferences from the conduct of the alleged participants or from circumstantial evidence of a scheme.” Id. at 1270 (citation and quotations omitted). “Indeed, because the crime of conspiracy is predominantly mental in composition, it is frequently necessary to resort to circumstantial evidence to prove its elements.” Id. (citation and quotations omitted).
The opinion concludes that the record is devoid of any evidence that Lopez-Posada knew of the existence of a plan to import the drugs into the United States, and that even if one were to infer that Lopez-Posada knew that the apartment he was guarding contained drugs that were leaving Ecuador, there is no evidence that Lopez-Posada possessed “a general understanding of the unlawful purpose of the plan,” United States v. Miranda, 425 F.3d 953, 958 (11th Cir.2005), i.e., that the drugs were to be imported to the United States.[1] *1235 The opinion writes that the only evidence concerning Lopez-Posada was that he was arrested with Arbane and that he was paid to guard the house where the drugs were found. The record does not support the opinion’s conclusion or its characterization of the evidence. The opinion entirely disregarded our long-standing precedent with regard to our standard of review. We must review the evidence in the light most favorable to the government and draw all reasonable factual inferences in favor of the jury’s verdict. Glasser v. United States, 315 U.S. 60, 80, 62 S.Ct. 457, 469, 86 L.Ed. 680 (1942). Furthermore, “[a] reversal is in order only if the evidence, viewed in the light most favorable to the [gjovernment, is such that a reasonably minded jury must have a reasonable doubt as to the existence of the essential elements of the crime charged.” United States v. Kelly, 749 F.2d 1541, 1545-46 (11th Cir.1985) (citation and quotation omitted). The opinion completely ignored our obligation to sustain the jury’s verdict if any reasonable construction of the evidence allowed them to find guilt beyond a reasonable doubt, see United States v. Bell, 678 F.2d 547, 549 (Former 5th Cir. Unit B 1982), and instead re-weighed the evidence in the light most favorable to the defendant. “It is not for us to weigh the evidence or to determine the credibility of the witnesses.” Glasser, 315 U.S. at 80, 62 S.Ct. 457.
The evidence viewed in the light most favorable to the government established facts from which the jury could reasonably infer that Arbane knowingly and voluntarily conspired with Lopez-Posada to import cocaine. The government presented substantial evidence to support its theory that Arbane paid Lopez-Posada to guard the cocaine, which was vacuum-sealed, wrapped in small packages and stored in an apartment in Guayaquil, Ecuador, until it was time for the drugs to be shipped by plane (and later, by boat) to the United States. For example, the government offered Lopez-Posada’s videotaped deposition and the trial testimony of Velez and an Ecuadorian police officer to prove Lopez-Posada’s knowledge of the cocaine he was guarding and his participation in the conspiracy to import. Lopez-Posada testified that he was a farmer from Colombia who left behind his family to live in a two bedroom apartment in Guayaquil for approximately ten months. During that time, he was paid $1,000 monthly to stay in the apartment. He used $300 to pay the rent, and the remaining money was for his expenses. He testified that he did nothing in the apartment but wait to be taken to a farm where he could work. On January 6, 2002, Arbane arrived at the apartment with a plastic bag, a typewriter, *1236 and another bag, which Lopez-Posada stored for Arbane at the apartment. That day, Lopez-Posada also changed the apartment locks. Two days later, on January 8, Arbane returned to the apartment, and he and Lopez-Posada were arrested there with 261 kilograms of cocaine, wrapped in 222 packages. The Ecuadorian police officer testified that the packages were sealed with silver wrapping tape and covered with an oily substance that had a strong, spicy odor. The packages were found in the bedroom closets. The police also discovered in the apartment a roll of silver packaging tape and two machines used for vacuum sealing. Velez testified that the vacuum machines were used to “vacuum pack,” or compress, the drugs so that they could fit into the Engineer’s plane’s hidden compartment, which could only fit approximately 200 kilograms of drugs. Velez further testified that he showed “Jose” (presumably, Lopez-Posa-da) how to use the vacuum sealing machines to compress the drugs so that the packages were small enough to fit in the hidden compartment of the plane, seal the packages in silver tape, and then cover the packages with a mixture of oil, cream, pepper, and mustard.[2] This oily substance was used as a repellent so that the dogs in any airport would not perceive the smell of the drugs.
Viewing this evidence in the light most favorable to the government, a reasonable *1237 jury could infer Lopez-Posada’s knowing and voluntary participation in the conspiracy to import from the circumstantial evidence. A jury could reasonably conclude that Lopez-Posada knew that he was being paid to guard the cocaine and prepare it to be imported. “[A] conspirator is not required to participate in all aspects of a conspiracy and may be convicted as a co-conspirator ... if [he] participates in some affirmative conduct designed to aid the success of the venture with knowledge that [his] actions would further the venture.” Pedrick, 181 F.3d at 1272. Lopez-Posada offered no other explanation as to why he was being paid $1,000 monthly to do nothing in the apartment but wait. Furthermore, he denied any knowledge of the cocaine hidden in the apartment closets despite having lived there for approximately ten months. The jury was entitled to use its common sense to discredit this testimony and infer his knowledge from the testimony of Velez and the police officer. See Garcia, 405 F.3d at 1270 (“Because credibility determinations are the exclusive province of the fact finder, we cannot disregard the jury’s credibility determination unless it is unbelievable on its face.”) (citation and quotations omitted).
Furthermore, conspiracy cases in which we have found sufficient evidence to convict a crew member aboard a ship with drugs bound for the United States are analogous and instructive. In United States v. Cruz-Valdez, 773 F.2d 1541, 1547 (11th Cir.1985) (en banc) (conspiracy to possess with intent to distribute), we ruled that “the government’s burden to prove participation is relatively light[,]” once it has been established that the defendant was a crew member aboard a ship laden with a large quantity of drugs. We may look to circumstances such as the large quantity of drugs, suspicious behavior before apprehension, inculpatory statements made after apprehension, witnessed participation as a crewman, and whether the drugs were obvious. Id.; see also, United States v. Munoz, 16 F.3d 1116, 1123-24 (11th Cir.1994) (applying Cruz-Valdez analysis in a conspiracy to import case); Gonzalez, 810 F.2d at 1543 (holding that evidence that the crewmen were aboard a ship with a large quantity of drugs, that the odor was noticeable from the deck, and that a crewman became nervous upon questioning, among other evidence, was sufficient to show the crewmen’s knowing and voluntary participation in the conspiracy to import). We also have found “particularly persuasive” the argument that “it is illogical to believe that one person would attempt [to import a large quantity of drugs] to the United States without pre-arranged assistance.” DeWeese, 632 F.2d at 1272; see also, Gonzalez, 810 F.2d at 1543 (“Courts and juries also may take notice of the fact that drug smugglers are unlikely to employ outsiders to work a vessel carrying [a large quantity of drugs].”). Several of the factors cited in Cruz-Valdez, which suffice to enable a reasonable jury to find guilt beyond a reasonable doubt, are also present here. Lopez-Posada was discovered with a large quantity of cocaine in the apartment, where the drugs would have been obvious considering their strong, spicy odor. He engaged in suspicious behavior including storing items for Arbane and changing the locks on the apartment. He made inculpatory statements at his deposition such as the fact that he was paid $1,000 monthly to do nothing but wait. Moreover, it is unlikely that Arbane would trust an outsider to prepare 261 kilograms of cocaine and guard it for 10 months. Though “a showing of knowing participation [in a conspiracy] is required[,]” “[c]ulpable participation need not be great.” Lyons, 53 F.3d at 1201. “Guilt may exist even when the defendant plays *1238 only a minor role and does not know all the details of the conspiracy.” Id. “The very nature of conspiracy frequently requires that the existence of an agreement be proved by inferences from the conduct of the alleged participants or from circumstantial evidence of a scheme.” United States v. Ayala, 643 F.2d 244, 248 (5th Cir. Unit A Apr.1981).
The tape recorded conversations between Arbane and Velez, as decoded by Velez at trial, further supported the conclusion that Arbane conspired with Lopez-Posada to import cocaine into the United States. During these conversations, the two used code words to refer to the drugs. Velez explained the meaning behind their words when he testified at trial. During their December 23, 2001, conversation, Ar-bane stated to Velez, “Look, the truth is that I want to take out that shit we have over there, that we have over there in Ecuador” and “I want to take that out fast.” Velez explained at trial that Arbane was referring to the drugs that they had been storing in Guayaquil. Velez asked, “What are we going to do with that shit? ... I have someone who can take it out .... I’ll pay you if it gets lost. That’s the deal.” Arbane responded, “yes, okay, I’ll put it in.” The two discussed the details of the deal, and then Velez asked, “When are we going, when can we do it?” to which Arbane responded, “I ... am available to do it on January 15th.” Velez agreed to the date and then stated, “We have to fax him, fax him the document of the vessel and the contents of the container, what is usually done. We have to send it out to him and he’ll take it out.”
At trial, Velez deciphered their conversation. He explained that the drugs were to be shipped by boat from Guayaquil to Mexico and from Mexico to Miami, and then he had someone who could take the drugs off the boat when it arrived in the United States. Arbane would need to fax the shipping documents for the boat, so that he “would know what goods the boat was bringing that was coming from Guayaquil to Miami — Guayaquil to Mexico and Mexico to Miami.” Velez further testified that shortly after that conversation, in January of 2002, Arbane traveled to Guayaquil to facilitate moving the drugs out of Ecuador (where they were stored and guarded by Lopez-Posada) and into the United States. Two days before Arbane’s arrest, on January 6, 2002, the same day that Arbane first arrived at the apartment, Velez and Arbane spoke again, this time about what percentage each would take from the sale of the drugs. Arbane asked, “You told me that he wants thirty, thirty for you and thirty for me, like that?” Velez explained at trial that Arbane wanted to know what percentage the person in the United States would receive for taking the drugs off the ship; each of them would receive one-third share.
The opinion states that these conversations reveal that shipment of drugs by boat remained only a possibility and that Ar-bane did not agree to the plan. It relies heavily on Velez’s cross examination testimony during which he testified that Ar-bane did not want to import the drugs to the United States during the indictment period.[3] Although there was conflicting *1239 testimony in this case, particularly during the direct and cross examination of Velez, the jury is entitled to draw reasonable inferences from circumstantial evidence. “Evidence need not be inconsistent with every reasonable hypothesis except that of guilt in order to be sufficient. The jury is free to choose among reasonable constructions of the evidence.” United States v. Lyons, 53 F.3d 1198, 1202 (11th Cir.1995). The conversations, combined with Velez’s explanation on direct examination of the plan to import the drugs to Miami and the fact that Arbane traveled to Guayaquil to facilitate the move directly after their conversation, reveals that Arbane did in fact agree to the plan and desire to import cocaine into the United States.
In sum, the evidence to support the charged conspiracy was presented through Velez’s testimony that Lopez-Posada was the man who was paid to guard the drugs, that Arbane planned to import the drugs by boat to Miami, and that Arbane traveled to Guayaquil to facilitate the plan. The tape recorded conversations between Velez and Arbane during which they discussed the details of the importation, Lopez-Posada’s videotaped deposition during which he testified that he was paid a large amount of money to live in the apartment where the drugs were seized, and testimony of the Ecuadorian police officer who found both Lopez-Posada and Arbane at the apartment with the drugs also supported the conspiracy charge. There was evidence about the amount of drugs, the careful packaging of the drugs, and the length of time that Lopez-Posada was guarding the drugs. This evidence was sufficient circumstantial evidence from which a rational jury could infer that Lopez-Posada knew of the cocaine, knew that it was headed for the United States, and assisted in this plan. The jurors had plenty of evidence on which to convict Arbane, and therefore, I would affirm.

. Judge Barkett's opinion seems to read a new essential element into the offense of conspiracy-to-import: knowledge on the part of an unindicted co-conspirator as to the intended destination of the drugs. Such a reading places an enhanced burden on the government that is not supported by our precedent, which speaks in terms of the defendant’s knowledge, not the knowledge of an unindict-ed co-conspirator such as Lopez-Posada. See Garcia, 405 F.3d at 1270 ("[T]he government must only prove that the defendant[] knew the essential nature of the conspiracy.'') (citation and quotations omitted) (emphasis added); United States v. Pedrick, 181 F.3d 1264, 1272 (11th Cir.1999) ("[T]he evidence need not show that each defendant knew of each phase of the conspiracy, all of its details, all of the conspirators, or the participants in each event.'') (emphasis added); United States v. Brazel, 102 F.3d 1120, 1131-32 (11th Cir.1997) (“A defendant may be culpable even if he ... played a minor role in the conspiracy, since a conspirator need not know the details of each act making up the conspiracy.”) (emphasis added); United States v. Pantoja-Soto, 739 F.2d 1520, 1525 (11th Cir.1984) ("[T]he government must demonstrate ... that the accused had knowledge of at least the essential objective of th[e] agreement ....”) (emphasis added); United States v. Pintado, 715 F.2d 1501, 1503 (11th Cir.1983) (per curiam) ("To be guilty of a conspiracy a defendant need not have knowledge of every detail of the conspiracy. Knowledge of the primary objective of the conspiracy will suffice.”) (emphasis added). In fact, the opinion does not cite to a single conspiracy-to-import case, from any circuit, in which the government was required to prove that an unindicted co-conspirator knew that the drugs were headed for the United States in order to establish the defendant’s guilt.
Evidence of an unindicted co-conspirator’s particular knowledge as to the object of the alleged conspiracy (here the importation of drugs into the United States) is certainly relevant to establishing the existence of a conspiratorial agreement, but it is the agreement-not the unindicted co-conspirator’s particular knowledge-that is the essential element to be proved. Because a conspiratorial agreement can be established by circumstantial evidence, one can conceive of numerous plausible scenarios in which the existence of a conspiracy to import drugs into the United States can be inferred without any specific showing as to an unindicted co-conspirator's knowledge of its object. The question then becomes whether the defendant knew the essential nature of the *1235 conspiracy and joined il voluntarily-and even this can be proven by circumstantial evidence. See United States v. Gonzalez, 810 F.2d 1538, 1542-43 (11th Cir.1987) (per curiam); United States v. DeWeese, 632 F.2d 1267, 1271-72 (5th Cir.1980). For example, in DeWeese, the defendant’s intention to import drugs into the United States was proven with only one Coast Guard Commander's testimony, which was based on inferences drawn from navigational charts discovered aboard the boat, that the boat carrying the drugs was heading toward the United States, instead of Mexico, Cuba, or the Bahamas. 632 F.2d at 1271.
In this case, the jury was not instructed that in order to convict Arbane it must find that the government proved Lopez-Posada's knowledge. Rather, the jury was instructed properly that in order to convict Arbane it must find ''[t]hat two or more persons ... came to a mutual understanding to try to accomplish a common and unlawful plan,” "[t]hat the Defendant, knowing of the unlawful purpose of the plan, willfully joined in it; and [t]hat the object of the unlawful plan was to import ... cocaine into the United States ....” (emphasis added).

. The opinion writes that Velez never identified Lopez-Posada as the man called "Jose” and refuses to infer that Velez was referring to Lopez-Posada when he testified that he showed "Jose” how to vacuum-pack the drugs. To be exact, Velez testified:
On that trip that I took to Guayaquil, [Ar-bane] took me to a house that had two floors. The drugs were there at that house, and two other people were guarding the drugs. One person had sort of a swarthy or darkish skin, and another person had perhaps Indian features, and he was called Jose.
At that house I inspected all the drugs with [Arbane], Geraldo and those other two, and I asked them to do me a favor. I showed them how to manipulate this vacuum packer, and we used two types of wrapping tapes. One was first coffee color or brown, and then the other one was gray. And then we left the drugs all ready to that house.
Later, he testified:
And [Arbane] told me we have more than 200 kilos stored in Guayaquil and we need to pay for the security for that. He told me that Jose, the person that I had met, was storing the drugs at a house and that he moved it to another, but it was always with security, and he told me that that entailed some expense.
(emphasis added). Next, Velez testified:
There were two different kinds of expenses. One was to take care of the legal problems that [Arbane] had in Guayaquil, Ecuador, and then the other expenses was the person that was guarding the drugs in the house, and all the expenses that were occurred in Guayaquil.
Velez unequivocally identified Lopez-Posada in a picture and explained that Lopez-Posada was the man to whom he was referring when he testified about the expenses involved in paying "the person that was guarding the drugs in the house.” Finally, Velez distinguished Lopez-Posada from the only other "Jose” mentioned regularly in this case, Jose Luis Jimenez, also known as the Engineer:
Q: And there was mention in that phone call [during which Arbane and Velez discussed the expenses involved in guarding the drugs in Guayaquil] of a man named Jose Luis.
A: The mention was of Luis and Jose-of Jose Luis. Luis is one person; Jose is another.
Q: Is this [referring to the photograph picturing Lopez-Posada] the Jose that was mentioned in that telephone conversation?
A: Yes, sir.
Q: And who introduced you to this Jose?
A: [Arbane] in Guayaquil, Ecuador.
In light of this testimony, to conclude that "Jose” was anyone other than Lopez-Posada would itself be an unreasonable conclusion. A reasonable jury could infer that Jose Lopez-Posada, the man who guarded the drugs, is the same "Jose” who Velez testified he showed how to pack the drugs where the drugs were being stored and guarded.

. However, even on cross examination Velez testified that "the goal was to bring the drug that we had in Ecuador to the United States.” In response to defense counsel's question, "Did you talk on direct examination about the option of having drugs on a ship to go all the way to Miami?” Velez testified, "Yes. I explained previously ... that there were two options: One to take the drugs to Mazatlan, and the other one from Guayaquil to Miami.” He reiterated, "We had a plan since December of the year 2000[,]” when they met in Ecuador and discussed two options: "On a boat-on a vessel ... that would make a stop *1239 in Mexico and then would go on to the United States; or another vessel that would leave directly from Guayaquil to Miami.” Moreover, on redirect, he explained that once Ar-bane fixed his problem in Ecuador, "the agreement" was to "[g]o back and pick up the drugs and send them to Mexico and then the United States or to Miami directly.” The government asked, "had the situation with the agreement changed on January 6th?” to which Velez reiterated, "No. [Arbane] was expecting to or waiting until he got to Guayaquil ... to fix his personal problem and im-médiately get our drugs out of Ecuador.” And, in response to the question "[W]hat was the status with [Arbane] and the drugs” "as of January 6th[?],” Velez responded, “[Arbane] was going to get the drugs. He was going to move them out of Ecuador. He was going to send them to Mexico, and if they couldn’t be gotten into Mexico, he was going to send them to the United States.”